[Civ. No. 27848. Fourth Dist., Div. Two. Aug. 10, 1982.]

THE PEOPLE, Petitioner, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
ROBERT MACIEL et al., Real Parties in Interest.

**COUNSEL**

Cecil Hicks, District Attorney, Michael R. Capizzi, Assistant District Attorney, William M. Bedsworth and Douglas H. Woodsmall, Deputy District Attorneys, for Petitioner.

No appearance for Respondent.

Karch & Odriozola, Karch & Connolly, Richard L. Karch, Dennis M. McNerney, Proctor & McNerney, Okuley & Reopelle and Gerald J. Reopelle for Real Parties in Interest.

## Opinion

**THE COURT.**\*—Robert Maciel, Vincent Maciel and Louis Peralta, real parties in interest (hereafter defendants), were charged with murder (Pen. Code, § 187) with a special circumstance allegation that the murder was committed while lying in wait (Pen. Code, § 190.2, subd. (a)(15)), and two counts of attempted murder (Pen. Code, §§ 187, 664.) At the preliminary hearing, the magistrate bound over each defendant on all charges and the special circumstance allegation.

Defendants moved to dismiss the special circumstance allegation in superior court (Pen. Code, § 995; *Ghent v. Superior Court* (1979) 90 Cal.App.3d 944, 954 [153 Cal.Rptr. 720]). The motion was granted.[1]

The People petitioned for relief from the trial court's ruling. We stayed the trial court proceedings and issued an alternative writ of mandate.

### The Facts

At approximately 7 p.m. on August 10, 1981, Jose Gonzales[2] drove Gustavo Cordero's white Chevrolet northbound up an alley parallel to Koledo Street in Huntington Beach. Manuel Ocampo was seated in the right front passenger seat and Cordero was seated in the back seat.

As the vehicle proceeded past a row of carports, defendants and a fourth man jumped out from behind the wall of one of the carports, where they had been concealed for approximately 45 minutes, and surrounded the Chevrolet. The Chevrolet stopped and one of the men asked the driver, "What happened last night?" When Gonzales failed to respond, the man hit him on his left cheek.

Two of the men jumped onto the hood of the vehicle and began kicking the windshield, while the other two men hit the vehicle with a baseball bat and a 20-inch long black rod or pipe.

---

\*Before Kaufman, Acting P. J., McDaniel, J., and Gardner, J.†

[1]The section 995 motion was decided based upon only the preliminary hearing transcript.

[2]The same individual is also referred to as Luis Gonzales at several places in the preliminary hearing transcript.

†Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.

Cordero immediately exited the vehicle and ran back down the alley. At approximately 10 to 25 second intervals, Ocampo and then Gonzales exited the vehicle and fled in the same direction.

Robert Maciel threw a bat at Gonzales, which struck and wounded him. Louis Peralta passed a rifle to Vincent Maciel, who fired five rounds at the fleeing men, wounding Cordero and killing Ocampo. They had fled about a half block. The entire incident probably lasted between 45 seconds and a minute.

Eighteen hours earlier, Huntington Beach Police Officer Monroe Mauney met Robert Maciel, Louis Peralta and a woman on Koledo Street. Robert Maciel reported that a beer bottle had been thrown through a nearby apartment window after a white 1965 or 1966 Chevy had been seen driving up and down Koledo Street with only its parking lights on. When Officer Mauney stated he would attempt to locate the Chevy, Robert Maciel responded that it was okay because he would eventually find the vehicle himself and kill the occupants.

Half an hour later, Officer Mauney observed a vehicle matching the description given by Robert Maciel in an open carport off an alley west of Queens Street. It was later determined that this vehicle was Cordero's vehicle.

## DISCUSSION

The issue in this case is whether the special circumstance allegation that victim Ocampo was killed while defendants were lying in wait was properly stricken.

■■■ Petitioner contends: (1) The special circumstance definition of "while lying in wait"[3] does not differ from the definition of "by means of . . . lying in wait" for first degree murder in Penal Code section 189[4]; and (2) no cognizable interruption existed to separate the period of lying in wait from the period during which the killing occurred.

---

[3]Penal Code section 190.2, subd. (a)(15), provides that the penalty shall be death or confinement for a term of life without the possibility of parole in any case of first degree murder where there has been a finding that "[T]he defendant intentionally killed the victim *while lying in wait*." (Italics added.)

[4]"All murder which is perpetrated *by means of* a destructive device or explosive, poison, *lying in wait*, torture, or by any other kind of willful, deliberate and premeditated killing . . . is murder of the first degree; . . ." (Pen. Code, § 189; Italics added.)

Only one other California appellate court has addressed and decided the first issue. (*Domino* v. *Superior Court* (1982) 129 Cal.App.3d 1000 [181 Cal.Rptr. 486].) After analyzing the "legislative history" of the "while lying in wait" special circumstance, which was added to the Penal Code by the 1978 Death Penalty Initiative (Prop. 7, Gen. Elec. (Nov. 7, 1978)), popularly known as the "Briggs Initiative," and analyzing the scanty case law defining "by means of . . . lying in wait" in the first degree murder statute, the majority concluded in *Domino* that the "lying in wait" special circumstance is more restrictive because ". . . to ignore or minimize the importance of the word 'while' would violate the policy of construing penal statutes in favor of the accused and would invade the legislative province." (129 Cal.App.3d at p. 1011.) We agree.

*Domino* reasoned: "To give proper impact to the term 'while' we read it as creating a requirement that where first degree murder has been 'perpetrated by means of . . . lying in wait,' the death penalty or life without possibility of parole may be imposed only if the appropriate temporal relationship exists between the killing and the lying in wait." (*Ibid.*) To satisfy this temporal relationship ". . . the killing must take place during the period of concealment and watchful waiting or the lethal acts must begin at and flow continuously from the moment the concealment and watchful waiting ends. If a cognizable interruption separates the period of lying in wait from the period during which the killing takes place, the circumstances calling for the ultimate penalty do not exist." (*Ibid.*, fn. omitted.)

A clear, cognizable interruption was present in *Domino*. The court held that the victim was not killed "while" defendants were "lying in wait" because one to five hours elapsed between the "lying in wait" and the killing. Also, the killing took place in an area geographically removed from the location defendants were "lying in wait."

This case is distinguishable from *Domino*. ██ ██ ██ The evidence, when supported by every legitimate inference, shows no cognizable interruption.[5] Defendants concealed themselves behind a

---

[5]An appellate court must apply the same standard of review here as the superior court does initially in deciding a section 995 motion based only upon a preliminary hearing transcript. Both courts act as reviewing courts, hence every legitimate factual inference must be drawn to uphold the magistrate's decision. (*Caughlin* v. *Superior Court* (1971) 4 Cal.3d 461, 464-465 [93 Cal.Rptr. 587, 482 P.2d 211] cert. den. (1971) 404 U.S. 990 [30 L.Ed.2d 541, 92 S.Ct. 539]; *Rideout* v. *Superior Court*

garage wall, rifle in hand. They intended to kill. They waited. The victims approached. Defendants ambushed the victims, attacked the car immediately, flushed the victims out of their vehicle, then gunned down Ocampo as he fled on foot, approximately 50 to 75 yards from the scene of the attack. The entire incident lasted about a minute. The events flowed continously. At no time was there any interruption of the attack.

Applying *Domino*'s interpretation of "while lying in wait," the facts in this case show "... lethal acts [which] begin at and flow continuously from the moment the concealment and watchful waiting ends." No "cognizable interruption" separated the period during which the killing took place from the period of concealment.

The superior court erred in granting the Penal Code section 995 motion to dismiss the special circumstance allegation because the evidence was insufficient to support the special circumstance allegation.[6]

Let a peremptory writ of mandate issue directing the superior court to vacate its order of March 22, 1982, granting the Penal Code section 995 motion to dismiss the Penal Code section 190.2, subdivision (a)(15) special circumstance allegation, to enter its order denying the motion and to proceed thereafter as provided by law. The stay order is vacated and set aside and is of no further force and effect.

The petitions of real parties in interest for a hearing by the Supreme Court were denied October 6 and October 8, 1982.

---

(1967) 67 Cal.2d 471, 474 [62 Cal.Rptr. 581, 432 P.2d 197].) The evidence is sufficient to support a special circumstance allegation at this stage if it shows reasonable cause or "some rational ground for assuming the possibility" that the murder was committed while defendants were lying in wait. (*Ghent v. Superior Court, supra,* 90 Cal.App.3d 944, 955-957.)

[6]In all fairness, the superior court judge did not have the benefit of *Domino*'s interpretation of Penal Code section 190.2, subdivision (a)(15), at the time the motion was granted.