[No. AO22029. First Dist., Div. One. Aug. 22, 1983.]

MARK RICHARDS, Petitioner, v.
THE SUPERIOR COURT OF MARIN COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

**COUNSEL**

Carl B. Shapiro and Dennis P. Riordan for Petitioner.

No appearance for Respondent.

John K. Van de Kamp, Attorney General, Thomas A. Brady and Charles J. James, Deputy Attorneys General, for Real Party in Interest.

**OPINION**

NEWSOM, J.—By his petition for writ of prohibition and/or writ of mandate, Mark Richards challenges three of four special circumstance allegations pleaded in an amended information filed against him in Marin County Superior Court. Richards is charged with violations of sections 187 (mur-

der), and 459 (burglary) of the Penal Code.[1] Four special circumstances are alleged: (1) murder for financial gain (§§ 190.2, subd. (a)(1), and 190.2, subd. (b)); (2) murder while lying in wait (§§ 190.2, subd. (a)(15), and 190.2, subd. (b)); (3) murder during the commission of burglary (§§ 190.2, subd. (a)(17)(vii), and 190.2, subd. (b)); and (4) murder during the commission of a separate burglary (§ 190.2, subd. (a)(17)(vii), and subd. (b)).[2]

Following denial of his section 995 motion, Richards sought timely relief from this court (§ 999a). He challenges only the lying in wait and burglary special circumstance allegations.

We issued a stay of petitioner's trial and an alternative writ in order to review the issues raised by the petition.

As will be seen, we agree that the evidence presented at the preliminary hearing and reasonable inferences therefrom will not support the allegation that the murder was committed "while lying in wait," and we issue our writ accordingly. In all other respects, however, the petition is denied.

A review of the factual context as presented at the preliminary hearing shows the following.

The victim, Richard Baldwin, was an acquaintance of both petitioner and his accomplices, Crossan Hoover and Andrew Campbell. Campbell, who was 17 at the time of the preliminary hearing, worked for petitioner in the latter's construction business. In early July of 1982, Campbell and Richards were working at Baldwin's home, adding on to the garage. Approximately three weeks prior to the day Baldwin was killed, Campbell first learned from Richards of the latter's plans for the murder. The subject arose between Richards and Campbell on more than one occasion and, around the first of July, Richards allegedly became more specific. Richards explained that Baldwin owed him money and that he had thought of killing him previously. His plan, as presented to Campbell and Hoover, was this: The three would go to Baldwin's house to work; Campbell would stay at the house to keep it open, while Richards and Hoover would entice Baldwin to the latter's garage-shop, where they would lure him out of sight and kill him with a convenient heavy object. Meanwhile, if the opportunity presented itself, Campbell was to go into the house and inventory it for items to sell at a later date. Richards promised Campbell $2,000 for staying at the house and

---

[1] All statutory references are to the California Penal Code.

[2] Richards is not alleged to be the actual killer. His counsel and the Attorney General inform us that the prosecutor has announced that the prosecutor will not seek the death penalty.

Hoover $5,000 for assisting in the actual killing. Further, Richards promised that the three would split Baldwin's possessions equally, and told Campbell Baldwin owned many cars which they could sell, along with machinery and tools from the shop.

Richards' plan, as presented to Campbell and Hoover, was apparently not of recent origin. In May of 1982, he allegedly approached another of his construction employees, William Robles, about killing Baldwin, telling Robles he was going broke and needed money fast, that Baldwin kept all of his money with him at home, and, in addition, had many cars at his garage, including a Rolls Royce, all of which could be sold. Robles told petitioner he would think about it, but joined the Navy in late June, disappearing from the scenario.

One Thomas Mills went to Baldwin's home to visit him on the morning of July 6, 1982, and while there saw Richards, Hoover and Campbell. When the three returned from a lunch break, Mills was about to leave. During their lunch break, according to Campbell's testimony, the trio discussed their murder plan, and agreed on certain refinements. Thus, upon their return, they planned to talk with Baldwin, "calming him down," and to inquire whether he had plans for the week of his murder, lest he be missed and suspicion aroused. If Baldwin had no plans, Richards and Hoover would persuade him to take them to his shop on the pretext that some of Richards' tools were there, while Hoover would indicate interest in seeing some of Baldwin's old cars. Richards told Hoover to use any heavy instrument he could find in the shop to kill Baldwin. Richards did not want to use a gun as it would make noise and leave traceable bullets, nor a knife, being fearful it might not kill Baldwin cleanly.

After lunch petitioner conversed with Baldwin, who showed his visitors several of his cars and invited them inside for cookies. Campbell now explained that, while Hoover had an interest in cars and wanted to see those in Baldwin's shop, he would himself rather stay at work on the house. Baldwin, Hoover and Richards thereupon left for the shop. While they were away, Campbell, as directed, searched the house for valuables. About two hours later, Hoover and Richards returned to the house, at which time petitioner told Campbell he did not want to discuss the murder—adding, however, that it had been "bloody" and that he wanted to get things out of the house quickly.

Eventually, the three removed from the house a large safe, a small metal box, marijuana, guns, ammunition, a wooden box and $2,000 in cash. They purchased a boat that evening, towed it to the Loch Lomond Marina, then

returned to the shop, where Baldwin's body lay under a Rolls Royce, in a pool of blood.

The trio used a mechanic's creeper to move Baldwin's body—wrapped in plastic—to petitioner's truck, drove to their boat and dumped the corpse in San Francisco Bay. Weights taken from the shop to sink the body snapped, however, and they were forced to use for their purpose an extra motor from the boat.

Baldwin's body was subsequently found floating in the bay and later examination showed two frontal stab wounds to his heart, a fractured skull, and brain damage from a blow to the left occipital portion of the skull. A bloody screwdriver and a bloody wrench—the apparent murder weapons—were found in the shop.

■ Before considering the substantive questions raised by the petition, we discuss certain procedural issues, first noting that special circumstance allegations are properly challenged before trial by a motion to dismiss. (Pen. Code, § 995; *Ghent* v. *Superior Court* (1979) 90 Cal.App.3d 944, 954 [153 Cal.Rptr. 720]; *People* v. *Superior Court* (*Mendella*) (1983) 33 Cal.3d 754, 761 [191 Cal.Rptr. 1, 661 P.2d 1081], as mod. 33 Cal.3d 974c; *Ramos* v. *Superior Court* (1982) 32 Cal.3d 26, 33 [184 Cal.Rptr. 622, 648 P.2d 589].) Review by this court is proper where both the motion below and the petition here are timely filed. (§§ 1510, 999a.) ■ It is equally well settled that "[a] reviewing court may not substitute its judgment for that of the magistrate as to the *weight* of the evidence, and every legitimate inference to be drawn from it must be drawn in favor of the information. [Citations.]" (*Ghent, supra,* 90 Cal.App.3d 944, 955; italics added.) Our inquiry is thus limited to a determination of whether or not the evidence provides "some rational ground for assuming the possibility" that the special circumstance allegations are true. (*Rideout* v. *Superior Court* (1967) 67 Cal.2d 471, 474 [62 Cal.Rptr. 581, 432 P.2d 197].)

I

We turn first to the "lying in wait" allegations, and to Penal Code section 190.2, subdivision (a), which provides: "The penalty for a defendant found guilty of murder in the first degree shall be death or confinement in state prison for a term of life without the possibility of parole in any case in which . . . . [¶] (15) The defendant intentionally killed the victim *while lying in wait.*" (Italics added.) ■ ■■■ Added to the Penal Code by the

1978 Death Penalty Initiative[3] (Prop. 7, Gen. Elec. (Nov. 7, 1978)), the "lying in wait" special circumstance has been twice interpreted by appellate courts of this state. (*Domino* v. *Superior Court* (1982) 129 Cal.App.3d 1000 [181 Cal.Rptr. 486]; *People* v. *Superior Court (Maciel)* (1982) 134 Cal. App.3d 893 [184 Cal.Rptr. 870].)

In *Domino, supra,* this court rejected the argument that the special circumstance "while lying in wait" provision was equivalent to the "lying in wait" provision for first degree murder contained in section 189.[4] The phrase is defined as "a waiting and watching for an opportune time to act, together with a concealment by ambush or some other secret design to take the other person by surprise. The lying in wait need not continue for any particular period of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation." (CALJIC No. 8.25.) Or, as succinctly explained by Justice Traynor in his concurring opinion in *People* v. *Thomas* (1953) 41 Cal.2d 470, 480 [261 P. 2d 1]: "Lying in wait requires the elements of waiting, watching, and concealment for the purpose of taking a victim unawares."

The court in *Domino* v. *Superior Court, supra,* read the term "while" "as creating a requirement that where first degree murder has been 'perpetrated by means of . . . lying in wait,' the death penalty or life without possibility of parole may be imposed only if the appropriate temporal relationship exists between the killing and the lying in wait." (129 Cal.App.3d 1000, 1011.) The court then held that "the killing must take place during the period of concealment and watchful waiting or the lethal acts must begin at and flow continuously from the moment the concealment and watchful waiting ends. If a cognizable interruption separates the period of lying in wait from the period during which the killing takes place, the circumstances calling for the ultimate penalty do not exist." (*Id.*) For agreement, see *People* v. *Superior Court (Maciel), supra,* 134 Cal.App.3d 893, 897; *People* v. *Harrison* (1963) 59 Cal.2d 622 [30 Cal.Rptr. 841, 381 P.2d 665]; and *People* v. *Rosoto* (1962) 58 Cal.2d 304, 355 [23 Cal.Rptr. 779, 373 P.2d 867].

---

[3]The purpose of charging and proving special circumstances is "to provide a rational basis for distinguishing those murderers who deserve to be considered for the death penalty and those who do not." (*Jones* v. *Superior Court* (1981) 123 Cal.App.3d 160, 165 [176 Cal.Rptr. 430]; cf. also *People* v. *Green* (1980) 27 Cal.3d 1, 61 [164 Cal.Rptr. 1, 609 P.2d 468], which speaks of the constitutionality of exposing to the death penalty "those . . . who killed in cold blood in order to *advance an independent felonious purpose,* . . .") (*Id.,* at p. 61; italics added.)

[4]Section 189 provides: "All murder which is perpetrated by means of . . . lying in wait . . . or by any other kind of willful, deliberate and premeditated killing . . . is murder of the first degree; . . ."

Petitioner argues forcefully that the facts so far developed will not reasonably support the lying in wait charges, principally because there is no evidence in the record showing the precise manner in which the murder occurred, and hence no basis for concluding that Baldwin's assailants approached him from physical concealment after "watchful waiting." (*People v. Thomas, supra,* 41 Cal.2d 470.) Petitioner also contends that the People cannot conceivably prove that the murder and the lying in wait were temporally concurrent, as allegedly required by section 190.2, subdivision (a)(15).

It is significant, petitioner avers, that while Campbell testified Richards said "we did it," he made no reference to the precise manner of killing, so that it may be "that the fatal blow . . . was struck from a concealed position [but] could be that it came long after the 'lying in wait' ended, if any such 'concealment' occurred at all."

Respondent does not cavil with the requirement that the killing must have occurred during, or at least immediately following, some period of watchful waiting from concealment, or, as the court in *Domino, supra,* put it, that "the lethal acts must begin at and flow continuously from the moment the concealment and watchful waiting ends." (*Domino v. Superior Court, supra,* 129 Cal.App.3d at p. 1011.) Rather, the Attorney General justifies the allegation on the theory that the element of concealment does not require physical hiding but may be satisfied merely by circumstances which by reasonable inference prove that petitioner obtained a position of advantage over his victim, then took him unawares.[5] (Cf. *People v. Ward* (1972) 27 Cal.App.3d 218 [103 Cal.Rptr. 671].)

On the present record, real party argues, sufficient evidence appears from which we can at least know, by reasonable inference, that the victim was taken by surprise and unawares—from behind. Thus, there is evidence that Baldwin was struck a lethal blow, and it is a reasonable inference from the position of his body and surrounding circumstantial evidence that he was

---

[5]While the "lying in wait" doctrine is not challenged on constitutional grounds, it is interesting to speculate on its purpose, and origins. One supposes that, quite apart from containing within itself the seeds of deliberation, premeditation and malice, it is perceived as a particularly cowardly form of murder—hence the opprobrium heaped on the western villain who killed from ambush. And in earlier, more religious times, special scorn was reserved for those who murdered victims in a fashion intended to deprive them of the opportunity for reflection and contrition. Thus, the piteous complaint of Hamlet's father that he was murdered "in the blossoms of my sin/Unhousel'd, disappointed, unanel'd/No reckoning made, but sent to my account/ With all my imperfections on my head . . . ." (Hamlet, act I, scene v., line 66ff.)

murdered from behind, by surprise, while showing petitioner his Porsche automobile.[6]

Assuming arguendo that real party's reconstruction of the murder is correct, we nevertheless reject the premise that merely taking the victim "unawares" satisfies the language of the statute as developed in decisional authority. Accepting real party's interpretation would require that we equate concealment with surprise, and ignore evidence that petitioner initiated the visit to Baldwin's garage and did not wait but simply *went* there, allegedly first to kill and then rob his victim.

While the decisional law is sparse, it reveals no support for real party's position.

A leading case is *People* v. *Tuthill* (1947) 31 Cal.2d 92 [187 P.2d 16], where it was held that a brief temporal gap between the commencement of the requisite combined physical concealment and "watchful waiting" and the moment of the murder was not fatal to the charge of lying in wait, and where the court further concluded that no attack from ambush was required to establish the special circumstance. In that case, however, the murderer had gone to his victim's house and literally there awaited her. When the victim returned, he permitted her to leave the room briefly; only upon her return, a few moments later, did he murder her.

We find in *People* v. *Tuthill, supra,* implicit acknowledgment that some period of physical concealment must precede the murder for it to be one committed "while lying in wait," and a further requirement that such concealment be accompanied by "watchful waiting." Moreover, it is clearly part of the high court's ruling in *Tuthill* that, while the murder need not occur *directly* from ambush or other concealment, lying in wait must be the general means by which it was accomplished. (31 Cal.2d 92, 101.)

The Attorney General places heavy reliance on *People* v. *Ward, supra,* 27 Cal.App.3d 218, as authority for the proposition that only concealment which puts the accused in a position of advantage to take the victim unawares is required; and that mere ruse, secrecy or deception, designed to place the victim in a position where he can be killed unawares, suffices as a basis for the concealment element of a lying in wait special circumstance allegation: literal physical concealment is not required. We think that, on the contrary, a close reading of *Ward, supra,* leads to an opposite conclusion.

---

[6]There was a large pool of blood by the Rolls Royce when the police examined the crime scene. A smaller pool of blood was detected near the Porsche and a trail of blood lay between the two cars.

The defendant in *Ward, supra,* waited in his car near the victim's apartment while an associate went to the apartment door to establish that the victim was at home. While the latter stood in the doorway defendant approached him. "The victim's questions 'Who are you?' and 'What is this?' when defendant approached the door were sufficient evidence that he was taken unawares." (*Domino, supra,* 129 Cal.App.3d 1000, 1009.)

In *Ward,* as here, the People argued that secrecy, as opposed to physical concealment, was pivotal and sufficient. The court, however, rejected the notion that the element of concealment was satisfied by mere secrecy, although it agreed that the killing did not have to take place from ambush. Rather " '[t]he gist of "lying in wait" is that the person places himself in a position where he is waiting and watching *and concealed from the person killed* with the intention of inflicting bodily injury upon such person or of killing such person.' " (*People* v. *Thomas, supra,* 41 Cal.2d 470, 473; italics added.)

To summarize, we are of the opinion that the evidence adduced at the preliminary hearing, and all permissible inferences therefrom, is insufficient to justify submission of the lying in wait special circumstance to a jury, and we accordingly order such allegation stricken.[7]

■ We turn now to the allegations, as special circumstances, that the murder occurred during the commission of burglary.

Section 190.2, subdivision (a)(17)(vii), provides the penalty of death or life without possibility of parole for any case in which "[t]he murder was committed while the defendant was engaged in or was an accomplice in the commission of, attempted commission of, or the immediate flight after committing or attempting to commit the . . . [felony]: . . . (vii) [b]urglary in the first or second degree in violation of Section 460." The information on file herein alleges that the Baldwin murder was committed during the commission of two separate burglaries: one at 18 Venicia Meadows (Baldwin's home) and the other at 36 Front Street (Baldwin's garage). Each is alleged as a separate special circumstance.

Petitioner contends that since the evidence clearly shows that the murder took place at Front Street and not at Venicia Meadows, it could not have

---

[7]It may not be inappropriate to add that real party's argument, while ably made, is tenuous if not mistaken, given decisional authority. Were we to embrace it simply because it is plausible, the record might well be found to contain reversible error. Where, as here, other special circumstances justifying equally harsh punishment are properly pleaded, and appear to rest on formidable evidence, our conclusion seems even more appropriate.

occurred while he was engaged in the Venicia Meadows burglary.[8] He also contends that there is no evidence he harbored any felonious intent upon the entry at Front Street except that of intent to commit murder. We first address the Front Street burglary.

■ As real party correctly observes, in order to establish that burglary has been committed, the prosecutor need only prove that the defendant entered the premises with the intent to commit a theft or *a* felony. The entry need not constitute a trespass. (*People* v. *Pendleton* (1979) 25 Cal.3d 371, 382 [158 Cal.Rptr. 343, 599 P.2d 649].) Moreover, the crime is not considered complete for all purposes upon completion of the entry.[9] The Attorney General agrees, as do we, that the *Domino* court's definition of the term "while" equally applies to the burglary special circumstance, so that a temporal coincidence is required.

■ And of course, a murder is not committed while a defendant is engaged in the commission of a burglary within the meaning of the special circumstance statute unless the accused kills in order to further that separate crime. A murder is not committed during a robbery within the meaning of the statute unless the accused has "killed in cold blood in order to advance an independent felonious purpose, . . ." (*People* v. *Thompson* (1980) 27 Cal.3d 303, 322 [165 Cal.Rptr. 289, 611 P.2d 883], quoting from *People* v. *Green* (1980) 27 Cal.3d 1, 61 [164 Cal.Rptr. 1, 609 P.2d 468].)[10]

■ Here, the evidence clearly supports the reasonable inference that petitioner, when he entered the garage, harbored both the intent to kill Baldwin *and* the intent to feloniously remove property from the garage. According to such evidence, it was indeed petitioner's plan at the outset, from his earliest conversations with Robles and with Campbell and Hoover, to kill Baldwin in order to obtain the latter's allegedly considerable property—from his home *and* from his garage.

---

[8]Petitioner theorizes: "[T]here is only one possible locus at which a burglary special can arise in a single victim murder: the place where the victim is killed. A double burglary special circumstance allegation in a single victim case is a legal impossibility."

[9]Compare *People* v. *Caudillo* (1978) 21 Cal.3d 562 [146 Cal.Rptr. 859, 580 P.2d 274], in which the court *assumed* that the sexual assault occurred during the commission of the burglary. The issue, of course, was whether that sexual assault resulted in great bodily injury for purposes of then section 461. In *People* v. *Walls* (1978) 85 Cal.App.3d 447 [149 Cal.Rptr. 460], the court held that a section 12022.7 enhancement (great bodily injury) could lie where the injury was inflicted after the actual entry. (*Id.*, at p. 453.)

[10]*Green, supra,* and *Thompson, supra,* involved the 1977 death penalty legislation which used the language "during the commission of" rather than "while the defendant was engaged in . . . the commission of" named felonies. "It seems clear, however, that the terms, 'while . . . engaged in' and 'during the commission of' should carry the same meaning." (*Ario* v. *Superior Court* (1981) 124 Cal.App.3d 285, 288-289 [177 Cal.Rptr. 265].)

Nor can we agree with petitioner that a double burglary allegation in a case involving a single murder victim is a legal impossibility. Implicit in petitioner's argument is the contention that spatial as well as temporal co-incidence is required to sustain the special circumstance allegation. "All persons concerned in the commission of a crime . . . whether they directly commit the act . . . or aid and abet in its commission, or not being present, have advised and encouraged its commission, . . . are principals" (Pen. Code, § 31); and, specifically as expressed in section 190.2, subdivision (b): "Every person whether or not the actual killer found guilty of intentionally aiding, abetting, counseling, commanding, inducing, soliciting, requesting, or assisting any actor in the commission of murder in the first degree shall suffer death or confinement in state prison for a term of life without the possibility of parole, in any case in which one or more of the special circumstances enumerated in paragraphs (1), (3), (4), (5), (6), (7), (8), (9), (10), (11), (12), (13), (14), (15), (16), (17), (18), or (19) of subdivision (a) of this section has been charged and specially found under Section 190.4 to be true."

Strong evidence at the preliminary hearing indicates that, during the time petitioner and Hoover were at the Front Street garage killing Baldwin pursuant to the conspiracy, Campbell entered the Venicia Meadows house to inventory it in order to expedite the planned theft. Thus, he burglarized the premises, and petitioner was a principal in that burglary. (Pen. Code, § 31.) Nothing in the language of section 190.2, subdivision (a)(17)(vii), requires a spatial as well as a temporal coincidence between the killing and the named felony: all that is required is an independent felony, advanced by a cold-blooded killing—which seems precisely the crime committed here.

Let a peremptory writ of prohibition issue restraining respondent superior court from taking further action on the allegation of violation of the provision of Penal Code section 190.2, subdivision (a)(15), in the proceedings entitled People v. Mark Richards, No. 8362, other than to dismiss the allegation. The stay of petitioner's trial heretofore imposed shall remain in effect until the finality of this opinion.

Holmdahl, J., concurred.

**RACANELLI, P. J.**—I concur but with the following observations:

I agree that the record contains sufficient evidentiary support concerning the Penal Code section 995 challenge to the special circumstances relating to the burglaries under the provisions of Penal Code section 190.2, subd. (a)(17)(vii); *People* v. *Superior Court (Mendella)* (1983) 33 Cal.3d 754 [191 Cal.Rptr. 1, 661 P.2d 1081], as mod. 33 Cal.3d 974c; *Rideout* v. *Superior*

*Court* (1967) 67 Cal.2d 471, 474 [62 Cal.Rptr. 581, 432 P.2d 197]; *Ghent* v. *Superior Court* (1979) 90 Cal.App.3d 944, 954 [153 Cal.Rptr. 720]. However, I believe that in order to sustain the enhancement allegation against petitioner concerning the alleged burglary of the Venicia Meadows residence, proof must be adduced that a temporal relationship existed between the murder and such burglary; namely, that the murder was committed *during the commission* of the underlying *residential* burglary (*People* v. *Green* (1980) 27 Cal.3d 1, 59 [164 Cal.Rptr. 1, 609 P.2d 468]; cf. *Ario* v. *Superior Court* (1981) 124 Cal.App.3d 285, 288-289 [177 Cal.Rptr. 265]) in which petitioner intentionally aided and abetted. (Pen. Code, § 190.2, subd. (b).)

Given the basic legislative design that *each* special circumstance have some rational basis differentiating which murderers should be executed, the critical determination whether the murder was committed during the commission of the specified burglary is not merely " 'a matter of semantics or simple chronology' " (*People* v. *Thompson* (1980) 27 Cal.3d 303, 322 [165 Cal.Rptr. 289, 611 P.2d 883]) and must be factually demonstrated in terms of temporal—if not spatial—propinquity.

A petition for a rehearing was denied September 20, 1983, and petitioner's application for a hearing by the Supreme Court was denied October 20, 1983.