[No. A038246. First Dist., Div. One. Apr. 21, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN BAUTISTA BERBERENA, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

\* Pursuant to California Rules of Court, rules 976 and 976.1, this opinion is certified for partial publication. The portions to be published follow.

**COUNSEL**

Kyle Gee and Henrikson & Gee for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Ronald E. Niver and Joyce E. Hee, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**STEIN, J.**—John Bautista Berberena was charged with first degree murder, burglary, robbery and arson. It was further alleged that Berberena had personally inflicted great bodily injury upon his victim. A jury found him guilty of all but the arson charge, additionally finding that he was not guilty of personally inflicting great bodily injury. Berberena was thereupon sentenced to a term of twenty-five years to life on the first degree murder conviction, a concurrent term of six years on the robbery conviction and a one-year enhancement for having served a prior prison term. Sentence was stayed on the burglary conviction.

### STATEMENT OF FACTS

The victim, Julio Gomez, was a drug dealer whose apartment appears to have been a gathering place for drug users. In July 1985, Elizabeth J. apparently stole a gram of cocaine and some money from Berberena. Several days later Berberena met Elizabeth at Gomez's apartment. Later, accompanied by Calvin Barrozo and his brother, Berberena drove her to a park where he allegedly raped and robbed her. After she reported this attack to the police, they drove her to Gomez's apartment. Gomez described Berberena to the police and directed them to Berberena's apartment.

A few days later Berberena, accompanied by Barrozo and Eugene Curley, visited Gomez. The following morning Gomez's severely burnt body was found in a back bedroom of his apartment. He died of multiple head injuries and bloodstains were found on the living room couch. A bloody hammer was found in the dining room, and a hypodermic syringe and needle were recovered from the back bedroom. The fire, which had spread through the apartment, originated on Gomez's clothing or on a blanket which wrapped his body. Gomez had ingested phencyclidine (PCP) shortly before his death.

Two versions of the events immediately leading up to Gomez's death were presented at trial. Barrozo testified that he had accompanied Berberena and Curley to Gomez's apartment. On the way, Berberena obtained a syringe which was partially filled with heroin. Berberena filled the syringe the rest of the way with battery acid, telling Barrozo that he intended to switch syringes so that Gomez would inject himself with battery acid. Barrozo understood that Berberena wanted Gomez killed because Gomez had helped the police find Berberena in connection with the alleged rape of Elizabeth.

After the three men entered Gomez's apartment, Berberena left in order to establish an alibi. As Curley was preparing the heroin, Barrozo heard other people enter the apartment. He became nervous, squirted the battery acid out of the syringe and threw it under the bed. When Berberena returned, he was told that Gomez had not injected the heroin because Barrozo had knocked over the "cooker." Barrozo and Berberena then left in order to obtain some PCP. As he was leaving, Berberena asked Gomez for a hammer to fix his truck. Gomez gave him one. In the truck, Barrozo explained to Berberena about squirting the acid out of the syringe and told him that he wasn't going to kill Gomez. He suggested that they just tie Gomez up, gag him and take his "stuff." Berberena agreed.

Berberena and Barrozo returned to Gomez's apartment with a PCP cigarette and the hammer. The four men shared the PCP cigarette, but Berberena and Curley appeared to be only faking inhalation. Barrozo stopped paying attention but sometime later saw Curley repeatedly strike Gomez on the head with the hammer. Berberena told Barrozo that he was supposed to have struck Gomez. Barrozo took the hammer and struck Gomez, telling Berberena, "Are you happy now?" Berberena and Curley wrapped Gomez in a bedspread and dragged him into a back bedroom. The men returned to the living room, picked up some of Gomez's belongings, including his stereo gear, and placed them in Berberena's truck. Barrozo and Berberena went back into the bedroom, where Berberena sprinkled cologne over Gomez and threw a lit match on the body.

Berberena's version of the events were contained in two pretrial statements he gave to the police. He denied that he had been involved in a rape of Elizabeth but admitted that he had left her at the park as punishment for having robbed him. In his first statement, Berberena denied ever seeing Gomez after the incident with Elizabeth. In a later statement, Berberena stated that he told Curley and Barrozo about her allegations and that he believed Gomez had "screwed [him] around." Curley and Barrozo then decided that Gomez should be "ripped off," but Berberena didn't really care one way or the other. The three men drove to Gomez's house where

Berberena traded Gomez a bag of heroin for a PCP cigarette and left. When he returned, he found the three men in Gomez's bedroom, arguing about the bag of heroin. Gomez made a move as if he were about to pick up a lamp and Barrozo picked up a hammer. Realizing that things were getting out of hand, Berberena left and visited a former girlfriend. He said the stereo equipment found in his car, which had been identified as Gomez's property, was entrusted to him by a colleague who he did not want to get involved.

DISCUSSION*

. . . . . . . . . . . . . . . . . . . . . .

### Lying in Wait

Penal Code section 189 provides, as relevant, that "[a]ll murder which is perpetrated by means of . . . poison, lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing, . . . is murder of the first degree. . . ."[2] The trial court, in accordance with CALJIC No. 8.25, instructed the jury that "Murder, which is immediately preceded by lying in wait is murder of the first degree. [¶] The term, lying the [sic ] wait is defined as waiting and watching for an opportune time to act together with a concealment by ambush or some other secret desire [sic ] to take the other person by surprise. The lying in wait need not continue for any particular period of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation."

### Concealment of Purpose

■ Berberena, relying on our decision in *Richards* v. *Superior Court* (1983) 146 Cal.App.3d 306, 315 [194 Cal.Rptr. 120], contends that CALJIC No. 8.25 is defective because it does not inform the jury that physical concealment is a required element of lying in wait.[3] It is undisputed that no physical concealment occurred in the present case. Under any version of the facts, Gomez was aware of the presence of his killers.

---

* See footnote, *ante*, page 1099.

[2] The requirement is perhaps imperfectly phrased since lying in wait, unlike torture or poison, cannot itself cause death.

[3] His reliance on *Richards* is misplaced. In *Richards,* we concluded that the special circumstance allegation of a murder committed "while lying in wait" (Pen. Code, § 190.2, subd. (a)(15)) required that some period of physical concealment precede the murder. The Supreme Court recently disapproved our holding in this regard. (*People* v. *Morales* (1989) 48 Cal.3d 527, 556-557 [257 Cal.Rptr. 64, 770 P.2d 244].)

There has been a divergence of opinion on the issue of the necessity of physical concealment, as contrasted with concealment of purpose, as an element of "lying in wait." Most recent cases hold that concealment of purpose is sufficient for a finding of first degree murder "by means of . . . lying in wait" within the meaning of Penal Code section 189. (*People* v. *Hyde* (1985) 166 Cal.App.3d 463 [212 Cal.Rptr. 440]; *People* v. *Ward* (1972) 27 Cal.App.3d 218 [103 Cal.Rptr. 671].)

The seminal case on whether concealment of purpose can amount to murder "by means of lying in wait" is *People* v. *Tuthill* (1947) 31 Cal.2d 92 [187 P.2d 16]. Tuthill was discovered by his estranged wife sleeping on a bed in her cabin with a rifle concealed beneath him. When she woke him up and asked him why he was there, he pointed the rifle at her. She told him he was not going to shoot her and left; however, when she returned almost immediately, he shot and killed her. The defendant argued that there was no evidence of lying in wait, first, because there was no element of surprise or concealment and, second, because whatever lying in wait may have existed ended when his wife left. The court noted that there appeared to be no California case precisely defining the phrase "lying in wait," but that it had been applied in other jurisdictions to a number of factual situations wherein the victim had been aware of the physical presence of the aggressor but not his true purpose.

The court in *Tuthill* found that "[t]he elements of waiting, watching, and secrecy all were present." (31 Cal.2d at p. 101.) Prior to killing his wife, the defendant literally had been lying in wait, his presence in the cabin had been unexpected, and his wife obviously was unaware of her danger. "The fact that she was shot on her return to the doorway indicates defendant's action was not hasty, and that his watch to kill was continuous and unbroken. This lying in wait was the 'means' through which defendant accomplished his purpose." (*Ibid.*)

Appellant argues that *Tuthill* merely expanded lying in wait from the classic ambush situation to include situations where the defendant, while concealed during the period of lying in wait, was not physically concealed at the time of the killing. We have concluded that the court in *Tuthill* disposed of the necessity of physical concealment by finding that concealment of purpose sufficed. The court reasoned that, although Tuthill may not have concealed himself by lying on the bed, he concealed the gun and therefore the purpose of his visit. Moreover, subsequent decisions by the court support the conclusion that the proposed interpretation is correct.

In *People* v. *Sutic* (1953) 41 Cal.2d 483, 492-493 [261 P.2d 241], the court found evidence of lying in wait even though the defendant was seen by one

of his victims sitting in his car 15 minutes before he drove it past the victims' house and shot into their windows. The court there noted that *Tuthill* "expressly states that the term has been applied to 'a number of factual situations wherein the victim has been aware of the physical presence of the aggressor' (p. 100) and is not limited only to instances of 'concealment in ambush' (p. 101). The elements of 'waiting, watching, and secrecy all were present' here, from which the jury could infer that the 'lying in wait' was a part of defendant's plan to take his victim later by surprise."

In *People* v. *Atchley* (1959) 53 Cal.2d 160, 175 [346 P.2d 764], there was evidence that the defendant had physically concealed himself from his victim and the court, therefore, did not specifically address the issue of concealment of purpose. Nonetheless, in disposing of the defendant's contention that there was insufficient evidence to justify giving an instruction on lying in wait, the court without comment cited an instruction which recited as relevant: "To constitute lying in wait, as the term is used in these instructions, a person's conduct must involve an intent to take another person unawares so as to do him bodily injury, and must include, as a means to that end, a waiting and watching for an opportune time to do the act, and also *either a concealment in ambush or some other secrecy of design to take the other person by surprise.*" (*Id.* at p. 175, fn. 4, italics added.)

Finally, in *People* v. *Morales, supra,* the Supreme Court put the issue to rest by adopting the reasoning of the court in *People* v. *Sassounian* (1986) 182 Cal.App.3d 361, 407 [226 Cal.Rptr. 880]: "The concealment which is required, is that which puts the defendant in a position of advantage, from which the factfinder can infer that lying-in-wait was part of the defendant's plan to take the victim by surprise. [Citation.] It is sufficient that a defendant's true intent and purpose were concealed by his actions or conduct. It is not required that he be literally concealed from view before he attacks the victim. [Citations.]"

*Intent*

▮ Barberena also attacks CALJIC No. 8.25 on the grounds that it does not inform the jury that they must find that the lying in wait itself, as opposed to the murder, must have been done with the intention to murder or seriously injure and that the jury similarly is not informed that the lying in wait must be the means of the murder.

Appellant's contention is colorable; indeed, Justice Traynor addressed similar concerns in his concurring opinion in *People* v. *Thomas* (1953) 41 Cal.2d 470 [261 P.2d 1]. The defendant in *Thomas* also argued that under the lying-in-wait instructions which were given, he could be convicted of

first degree murder even if he sought only to play a prank on his victim. (*Id.* at p. 475.) Justice Traynor answered: "By the use of the phrase 'or any *other* kind of willful, deliberate, and premeditated killing' following the phrase 'All murder which is perpetrated by means of poison, or lying in wait, torture,' the Legislature identified murder committed by any of the enumerated means as a 'kind of' willful deliberate, and premeditated killing. . . . [¶] If the killing is murder within the meaning of Penal Code, sections 187 and 188, and is by one of the means enumerated in section 189, the use of such means makes the killing as a matter of law the equivalent of 'a willful, deliberate, and premeditated killing.' Since any question as to the defendant's willfulness, deliberation, and premeditation is taken from the trier of fact by force of the statute [citations omitted], it bears emphasis that a 'killing' by one of the three means enumerated in the statute is not the equivalent of a 'willful, deliberate, and premeditated killing' unless it is first established that it is murder."

"If the killing was not murder, it cannot be first degree murder, and it is immaterial that the defendant was lying in wait. Otherwise, absurd results might follow. Thus, a defendant might lie in wait to frighten a person. Unknown to defendant, that person might have a defective heart. His death from a heart attack as a result of the fright would not be murder. Again, a killing that unintentionally results from a fist fight is ordinarily involuntary manslaughter. [Citations omitted.] If defendant lay in wait for his victim to engage in a fist fight with him and the victim dies as a result of the fight, that fact alone is not sufficient to make it the equivalent of a 'willful, deliberate, and premeditated killing.' " (*People* v. *Thomas, supra,* 41 Cal.2d at pp. 477-479.)

The instruction approved by the majority opinion in *Thomas* stated that the defendant was lying in wait if he was " 'waiting and watching and concealed from the person *killed* with the intention of inflicting bodily injury upon such person. . . .' " (41 Cal.2d at p. 473, italics added.) Justice Traynor reasoned, as does appellant, that this language would allow the jury to find the defendant guilty of first degree murder if he only intended some degree of "bodily injury" insufficient to support a finding of murder.

"That definition falls short of the definition of murder in sections 187 and 188 of the Penal Code. It is true that murder may be committed without a specific intent to take human life if the killing is committed under circumstances that show an abandoned and malignant heart. To be so committed, however, the defendant must intend to commit acts that are likely to cause death and that show a conscious disregard for human life. [Citations omitted.] . . . [A] mere intent to inflict 'bodily injury,' amounting to an assault and battery at most, would not be enough to constitute murder if a killing

resulted therefrom. . . . [T]he instruction on lying in wait was defective largely because the court failed to explain that *murder must first be established* before the question of lying in wait can arise." (*People* v. *Thomas, supra,* 41 Cal.2d at pp. 479-480, italics added.)

Six years later, Justice Traynor, writing for a unanimous court in *People* v. *Atchley, supra,* 53 Cal.2d 160, approved a jury instruction which, as relevant, read: "All murder which is perpetrated by means of lying in wait is murder of the first degree. [¶] To constitute lying in wait, as the term is used in these instructions, a person's conduct must involve an intent to take another person unawares so as to do him bodily injury, and must include, as a means to that end, a waiting and watching for an opportune time to do the act, . . . [¶] *When the killing of a human being amounts to murder* and is accomplished by lying in wait, it is murder of the first degree even though there did not exist in the mind of the slayer the specific intent to kill, but it is necessary that there be the intentional inflicting of bodily injury upon the person killed under circumstances likely to cause his death." (*Id.* at p. 175, fn. 4, italics added.)

■ Thus, a "murder by means of lying in wait" is one which occurs so immediately following a period of watching and waiting that there can be no lapse in the culpable state of mind between the homicide and the period of watchful waiting. (See *People* v. *Edelbacher* (1989) 47 Cal.3d 983, 1021 [254 Cal.Rptr. 586, 766 P.2d 1]; *People* v. *Ruiz* (1988) 44 Cal.3d 589, 615 [244 Cal.Rptr. 200, 749 P.2d 854].)

By 1975 the instruction had been modified by deleting the direct statement that the defendant must intend to inflict bodily injury while lying in wait. It read: "The term 'lying in wait' is defined as a waiting and watching for an opportune time to act, together with a concealment by ambush or some other secret design to take the other person by surprise. . . .

"To constitute murder by means of lying in wait there must be, in addition to the aforesaid conduct by the defendant, an intentional infliction upon the person killed of bodily harm involving a high degree of probability that it will result in death and which shows a wanton disregard for human life." (*People* v. *Benjamin* (1975) 52 Cal.App.3d 63, 81-82 [124 Cal.Rptr. 799].)

This instruction has been declared to be a correct statement of the law. (*People* v. *Ruiz, supra,* 44 Cal.3d at pp. 614-615, 625; *People* v. *Benjamin, supra,* at p. 84.) It instructs the jury that a murder must immediately follow the lying in wait and that murder must have been committed by the inten-

tional infliction of bodily harm involving a high degree of probability that death would result.

In 1985, CALJIC No. 8.25 was again revised. The paragraph requiring that the subsequent murder be the result of the intentional infliction of bodily harm was deleted; however, the "Use Note" for this instruction was changed to direct that CALJIC No. 8.11,[4] defining malice, be given with this instruction. ■■■ These were the instructions given at appellant's trial. They are a correct statement of the law. Before the jury could convict appellant of first degree murder, they had to find that Gomez was murdered either intentionally, or by means of an intentional act dangerous to life, performed with knowledge of the danger and conscious disregard therefor. In addition, the jury had to find that this murder was immediately preceded by a waiting and watching for an opportune time to act with a secret design to take the victim by surprise. Absent evidence that the murderer entertained an intent while lying in wait to commit an act different than that which immediately thereafter resulted in Gomez's murder, the jury may properly infer that both acts were motivated by the same intent.

Finally, we find no prejudicial harm in the court's use of the phrase "secret desire" when the approved phrase is "secret design." Under the facts of this case the jury, finding that Berberena harbored a secret desire to murder Gomez, must have found that he did it by secret design. Moreover, as the prosecutor correctly restated the instruction in his closing argument, it is unlikely that the jury was in fact misled by the court's misstatement.

. . . . . . . . . . . . . . . . . . . .*

The judgment is affirmed.

Racanelli, P. J., and Newsom, J., concurred.

A petition for a rehearing was denied May 18, 1989, and appellant's petition for review by the Supreme Court was denied July 12, 1989.

---

[4] Thus the court in accordance with CALJIC No. 8.11 instructed the jury that: "Malice may be either express or implied. [¶] Malice is express when there is manifested an intention unlawfully to kill a human being. Malice is implied when the killing results from an intentional act involving a high degree of probability that it will result in death, which act is done for a base anti-social purpose and with a wanton disregard for human life, or the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endagners the life of another and who acts with conscious disregard for life."

*See footnote, *ante*, page 1099.