Filed 2/2916  P. v. Velasco CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ULISES CARBAJAL VELASCO,<br><br>    Defendant and Appellant. | B259756<br><br>(Los Angeles County<br>Super. Ct. No. VA131846) |

APPEAL from a judgment of the Superior Court of Los Angeles County. John A. Torribio, Judge.  Affirmed.

Gail Harper, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Michael R. Johnsen and Arlene M. Games, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Ulises Carbajal Velasco was convicted of murdering his cousin, Sergio Lopez.  He challenges (1) the constitutionality of the lying-in-wait special circumstance, and (2) the sufficiency of the evidence showing that he killed the victim by lying in wait.  We reject both of defendant's contentions and affirm.

## FACTS

In the summer of 2013, defendant Velasco asked Eduardo Delarosa to help him obtain divorce papers.[1]  Eduardo has known defendant and Sergio Lopez since they were children.  Defendant believed that his wife, Dama, was having an affair with Lopez.  "Visibly upset," defendant disclosed his suspicions to Eduardo, adding that Lopez "was a ghost to him."  Eduardo suggested that defendant speak to Lopez.  Weeks later, Eduardo heard Lopez and defendant argue at length in Lopez's driveway:  defendant accused Lopez of sleeping with Dama, "kept referring to Sergio as a ghost" and "said that Sergio would say anything to save himself."  Defendant threatened Lopez, "If I find out you slept with Dama, I'll kill you myself."  Lopez strenuously denied the affair, crying and pulling on defendant's shirt for "many hours."

Eduardo's brother Mario Delarosa is a life-long friend of defendant and the victim.  Mario saw Lopez nearly every day.  During the summer of 2013, Mario saw (but could not hear) a lengthy argument between defendant and Lopez.  After the argument, defendant no longer visited Lopez, though he was a frequent visitor in the past.

Mario spent the evening with Lopez on September 11, 2013.  They drove to defendant's home in Lopez's Escalade, at around 11:30 or 11:45 at night.  Lopez wanted to smoke marijuana with defendant "and give him some bud," according to Mario.  After picking up defendant, the three men continued to a dead-end street to smoke.  Fifteen to 20 minutes later, Lopez drove defendant home and gave him some marijuana in a baggie.  Mario observed that defendant was "acting out of the ordinary . . . kind of nervous."

---

[1]     The opinion refers to Delarosa family members by their first names, for the sake of clarity.

Mario and Lopez returned to Lopez's home. While there, Lopez showed Mario a text message from defendant. In Mario's recollection, it read, "Hey fool I think I left my bud in your backseat. Could you go check if it's there." Lopez said he was going outside to his truck, parked in front of his house, to look for defendant's baggie.

Soon after, Mario heard three or four gunshots. After hesitating a minute or two, Mario went to check on Lopez. He found Lopez lying partly in the open back door of his SUV and partly on the ground, gasping for air. Lopez sustained three gunshot wounds, all of which took an upward trajectory. One bullet entered the back of the neck behind the right ear and exited through the mouth. Two fatal bullets entered the right back, striking the liver, heart, and left lung.

Rachael Delarosa is the wife of Eduardo and sister-in-law of Mario, and a friend of the victim and defendant. Around 1:00 a.m. on September 12, 2013, she and Eduardo learned of the shooting. Rachael telephoned defendant, who was awake but sounded "disoriented," "exhausted," and "out of breath" or "breathing heavily." She informed him Lopez was shot. Defendant replied, "Oh, he did." When she instructed him to "get down there right away," he responded, "Oh well, I don't know. I have to go to work tomorrow, you know. It's late already." Defendant later called to tell Rachael that he was at the shooting site. Defendant approached a deputy and said that he was the victim's cousin.

One of Lopez's neighbors was studying by a window on the night of September 11-12, 2013. He saw an interior car light illuminate. At the same time, a car door opened and a person walked over to the vehicle with the interior illumination. He heard gunshots and saw the same person run away. The eyewitness was unable to see the shooter's face in the darkness, noting only that he had a dark complexion. The entire incident lasted between 30 seconds to one minute. There were no other people in sight.

Another of the victim's neighbors was in bed. She heard four gunshots in rapid succession, and went to the front window in time to see a white pickup truck with a dark stripe pulling away abruptly from the curb across the street, without headlights on. Soon after, law enforcement officers arrived. Around 2:00 a.m., the witness noticed that the

3

same white truck had returned to the shooting scene and "it was parked in the exact same spot." She pointed the truck out to a deputy. There was "a lot of ruckus" as an officer detained a person who was walking away from the truck.

The white pickup truck is registered to Leticia Velasco at the same address in Norwalk where defendant resided, less than five miles from the shooting scene. Officers detained defendant at the scene, took him to jail, interviewed him, and removed two cell phones from him. Gunshot residue was found on defendant's shirt and shorts.

A cell phone found in the victim's pocket contained text messages between Lopez and defendant. On the night of September 10, 2013, defendant wrote, "Hey cuz you got any herb." Lopez replied that he was not around, but would be back the next day. On September 11, defendant again wrote, "You got herb cuz." Subsequent messages indicate that defendant and Lopez made a plan to meet, once Lopez obtained marijuana. Later, defendant texted, "Can you check if I dropped my bud . . . in the car." Lopez wrote back, "Let me check." Defendant replied, "K."

Investigators obtained a surveillance tape of the area near the shooting scene. The tape shows that at 12:58 p.m., a vehicle pulls up and the lights go out. A person runs up to the vehicle at 1:03, the vehicle's brake lights go on, but not its headlights, and it drives away. At 2:23 a.m., the same vehicle pulls up in the same spot: defendant emerges and approaches the shooting scene. He was intercepted off camera by deputies. The video time stamp was about two minutes slower than actual time.

Detectives arranged to monitor and tape defendant's jail visitors. On September 28, 2013, defendant was visited by Joanna Solis. Defendant was recorded discussing a search warrant that was executed at his home following his arrest. Solis states, "They're saying they didn't get anything, and I was like, oh, my gosh." Defendant notes that "in a letter, I'll let you know where you could get it and probably take it somewhere." He remarks, "It was, like, right under their eyes and they couldn't see it," adding, "I made it disappear." He continued, "Trust me, I did what I had to do. . . . So you know, it was kicked in the backyard and, yeah, it's under there. . . . You should let me know before my dad plans on pouring cement." Defendant tells Solis, "[Y]ou don't

4

want to grab it . . . . You don't want to touch it, man, or just grab it. It's in a bag." Solis replies, in Spanish, "I'll grab it with a rag." Later, defendant reminds Solis to find out when his father plans to pour cement, and then defendant would let his parents know "where it's at."

After listening to defendant's recorded conversation, investigators searched the back yard of defendant's residence. There, they unearthed a plastic bag containing a loaded .38 caliber revolver, a holster, and a box of bullets. The microscopic characteristics of a test round fired from the revolver matched an expended bullet found on the running board of the right rear passenger door of the Escalade, where Lopez fell, as well as the bullets removed from Lopez's body during an autopsy. Solis admitted at trial that she saw defendant with a revolver months before the shooting.

A jury found defendant guilty of first degree murder and of being a felon with a prior conviction in possession of a firearm. (Pen. Code, §§ 187, 29800, subd. (a)(1).) It found true the special circumstance that defendant killed the victim by means of lying in wait (Pen. Code, § 190.2, subd. (a)(15)); it also found that he personally used a firearm (Pen. Code, § 2022.53, subds. (b), (c) & (d)). He was sentenced to life imprisonment without the possibility of parole for murder, plus a consecutive term of 25 years to life.

## DISCUSSION

### 1. Constitutionality of the Lying-in-Wait Special Circumstance

Defendant argues that "the lying-in-wait special circumstance is unconstitutional because it fails to perform the narrowing function required by the Eighth Amendment and fails to ensure that there is a meaningful basis for distinguishing those cases in which the death penalty or LWOP are imposed from those in which they are not."

The Supreme Court has, in its words, "repeatedly rejected" constitutional challenges that the lying-in-wait special circumstance fails to narrow the class of persons eligible for death or distinguish the cases in which the death penalty is imposed from the cases in which it is not imposed. (*People v. Nakahara* (2003) 30 Cal.4th 705, 721. See, e.g., *People v. Morales* (1989) 48 Cal.3d 527, 557-558; *People v. Roberts* (1992) 2 Cal.4th 271, 322-323; *People v. Carasi* (2008) 44 Cal.4th 1263, 1310; *People v.*

5

*Crittenden* (1994) 9 Cal.4th 83, 154-156, and *People v. Edelbacher* (1989) 47 Cal.3d 983, 1023 [the lying-in-wait special circumstance does not violate the Eighth Amendment]; *People v. Cage* (2015) 62 Cal.4th 256, 281 [declining to reconsider the constitutionality of the lying-in-wait special circumstance].)

In *People v. Gutierrez* (2002) 28 Cal.4th 1083, the defendant argued that the special circumstance of lying in wait is unconstitutional because there is no significant distinction between first degree murder by lying in wait, and the special circumstance of lying in wait, thereby failing to meaningfully narrow the penalty. The Court wrote that murder by means of lying in wait requires only a wanton and reckless intent to inflict injury likely to cause death. However, when the evidence establishes an intentional murder involving (1) a concealment of purpose; (2) a period of watching and waiting for an opportune time to act; and (3) a surprise attack on the unsuspecting victim from a position of advantage, these special circumstances are distinct from "ordinary" premeditated murder and justify the most severe penalty. (*Id.* at pp. 1148-1149, citing *People v. Morales*, *supra*, 48 Cal.3d at p. 557.) "[C]oncealment of purpose inhibits detection, defeats self-defense, and may betray at least some level of trust, making it more blameworthy than premeditated murder that does not involve surprise." (*People v. Stevens* (2007) 41 Cal.4th 182, 204.)

## 2. Sufficiency of the Evidence

As noted above, the elements peculiar to the special circumstance are a concealed purpose, plus "watchful waiting and a surprise attack upon an unsuspecting victim, either by ambush or by taking the person unaware." (*People v. Sims* (1993) 5 Cal.4th 405, 434.) "Watchful" means "'alert and vigilant' in anticipation of the victim's arrival to take him or her by surprise." (*People v. Streeter* (2012) 54 Cal.4th 205, 247.)

"[T]he lying-in-wait special circumstance requires no fixed, quantitative minimum time, but the lying in wait must continue for long enough to premeditate and deliberate, conceal one's purpose, and wait and watch for an opportune moment to attack." (*People v. Bonilla* (2007) 41 Cal.4th 313, 333.) The special circumstance may be found true if "'the lethal acts [ ] begin at and flow continuously from the moment the concealment and

6

watchful waiting ends.'" (*People v. Morales*, *supra*, 48 Cal.3d at p. 558.) We view the evidence in the light most favorable to the judgment, presuming the existence of every reasonable inference that may be derived from the evidence. (*People v. Gutierrez*, *supra*, 28 Cal.4th at p. 1149; *People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

The evidence in this case amply supports the special circumstance of lying in wait. Defendant texted Lopez, ostensibly to obtain marijuana. When they met, defendant was "nervous" and "acting out of the ordinary," inferably because his murder plan was in play. Later that night, defendant moved forward with his plot, when he claimed to have forgotten the marijuana in Lopez's car. Apart from fabricating an excuse to entice the victim outside at 1:00 a.m., when no witnesses were likely to be present, defendant lay in wait near Lopez's home. A surveillance camera recorded defendant's vehicle entering the area beforehand. When he arrived, defendant had an opportunity to deliberate. He could have rethought the entire idea of shooting a close relative in cold blood. He could have restarted his truck and driven away. He did not do so.

Secreted from view, defendant sent Lopez a text message: "Can you check if I dropped my bud . . . in the car." In response, Lopez wrote, "Let me check." Without making a threat or disclosing his true, murderous intentions, defendant sent Lopez on an errand that would remove him from the safety of his house and leave him defenseless to an attack from behind.

Though hidden from Lopez's view, defendant could see when the victim left the house. Actual physical concealment from view is not required for the lying-in-wait special circumstance. (*People v. Coombs* (2004) 34 Cal.4th 821, 853.) Nonetheless, defendant was literally hidden from view when Lopez walked out of the house and into the trap. (Compare *Richards v. Superior Court* (1983) 146 Cal.App.3d 306, 314-316, in which the victim willingly accompanied the defendants into a garage, where they killed him. *Richards* was disapproved because it required an actual physical concealment as a element of lying in wait, in *People v. Morales*, *supra*, 48 Cal.3d at pp. 556-557.)

Defendant waited for an opportune moment to attack, when his unsuspecting cousin opened the car door to check for a baggie of marijuana. A neighbor saw the

7

interior light illuminate in Lopez's car when he opened the door. This prompted defendant to walk over and approach the open car door on the dark street. As Lopez leaned over the backseat, looking for defendant's supposedly lost marijuana, he was ambushed. From behind, a position of advantage, defendant shot Lopez multiple times, in a surprise attack. The upward trajectory of the bullets described by the coroner indicates that the victim was bent downward when he was shot in the back. There was one continuous flow from the time defendant sent a text message to lure the victim outside to the time that he left his truck, walked over, and shot the victim in the back.

Both the surveillance tape and a neighbor who was awakened by gunshots caught defendant's vehicle leaving the shooting scene promptly afterward, only to return to the exact spot about an hour later. The jury could reasonably deduce that Lopez never saw his attacker approach from behind, and never had a chance to plead for his life. For his part, defendant never had to look his cousin in the face before killing him, and was safe from being identified as the shooter had the victim survived the attack.[2] The special circumstance of murder by means of lying in wait was warranted by the evidence.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


BOREN, P.J.

We concur:


CHAVEZ, J.                    HOFFSTADT, J.

---

[2]     As one court has observed, an ambush "is perceived as a particularly cowardly form of murder." (*Richards v. Superior Court*, *supra*, 146 Cal.App.3d at p. 314, fn. 5.)