[Civ. No. 53772. First Dist., Div. Three. Mar. 23, 1982.]

JOSEPH J. DOMINO, Petitioner, v.
THE SUPERIOR COURT OF ALAMEDA COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

[Civ. No. 53787. First Dist., Div. Three. Mar. 23, 1982.]

JOHN R. TAPIA, Petitioner, v.
THE SUPERIOR COURT OF ALAMEDA COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

COUNSEL

Howard C. Hall, Jules F. Bonjour, Jr., Michael L. Marowitz and Bonjour, Gough, Stone & Remer for Petitioners.

No appearance for Respondent.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, William D. Stein, Assistant Attorney Gen-

eral, Robert R. Granucci and Christopher J. Wei, Deputy Attorneys General, for Real Party in Interest.

## OPINION

**WHITE, P. J.**—These two petitions challenge denial of motions to dismiss (Pen. Code, § 995) in a special circumstance murder prosecution against two defendants. Petitioners raise a number of objections centering upon the adequacy of the evidence. We accept the contention that the evidence does not support the special circumstance allegations that victim Louis Reyes was killed while defendants were lying in wait. We reject the remaining contentions.

Petitioners are charged by information with two counts of first degree murder (Pen. Code, § 187) with various firearm and great bodily injury enhancements and with the special circumstances that the two murders were committed while lying in wait (Pen. Code, § 190.2, subd. (a)(15)) and that each is one of multiple murder offenses resulting in conviction in this proceeding (Pen. Code, § 190.2, subd. (a)(3)).

Petitioner Domino moved to dismiss all charges pursuant to Penal Code section 995. Petitioner Tapia's moving papers have not been furnished and he has not described in detail his motion below. However, it appears that he sought to dismiss the lying in wait special circumstance as to each count, the multiple murder special circumstances and the charge of murdering Hernandez. The two motions were denied in all respects. These petitions followed.

### The Facts

The bizarre facts of this case come primarily from the preliminary hearing testimony of Marcus C. West. He testified that he and victim Louis Reyes were in the practice of staging "drug ripoffs." Petitioner Tapia got the idea that Reyes was planning to rip him off and that West was involved in the plan. Tapia therefore kidnaped West, held him for one week at his house, and had West call Reyes to set him up.

The plan was for West to tell Reyes he could score some heroin from a motor home parked outside the house of Tapia's friend. Reyes would

be surprised there. According to West, Tapia told him he wanted only to talk to Reyes and work him over; nothing was said about killing him.

West called Reyes to set the plan in motion. At 8:30 or 9 p.m., he went with two of Tapia's friends to pick up Reyes. At Reyes' house they picked up both Reyes and victim Michael Hernandez, who was visiting Reyes. The two were taken to the house where the motor-home was kept. West and Tapia's friends went into the house, while the two victims went toward the motor-home.

Shortly after he went inside the house, West heard two shots. Some 20 minutes later, petitioner Domino carried Hernandez into the house and dropped him on the floor, where he died. Later, the occupants, including West, each threw a knife into his body. Fifteen minutes after that Tapia walked in leading Reyes, who was clad only in underwear. Reyes, handcuffed and in pain when he was brought in, was thrown into the bathroom where Tapia beat him savagely.

Both Tapia and Domino directed West to wrap up Hernandez's body, which was later placed in the back of a truck. Domino told West to look for an expended cartridge from a shot he fired. He directed West to a spot inside the motor-home where he had been standing. West found the cartridge in the corner, near the windshield. Tapia directed West to look for a cartridge in some bushes about 30 feet from the motor-home, where he said he had been lying down with his gun. No cartridge was found.

Shortly after Hernandez's body was placed in the back of the truck, West was directed to throw some garbage into the truck bed. Then Domino and Tapia took Reyes in the front seat of the truck. West was taken back to Tapia's house. Fifteen minutes after he arrived, Domino and Tapia came in without Reyes. Tapia talked for a while with a neighbor. Then at 2 or 3 a.m., he and Domino left. They returned around 6 a.m., the truck bed empty.

Almost two months later the bodies of Reyes and Hernandez were found in the Stanislaus River, bound together and weighted down with bricks. Reyes had four bullet wounds in his head, identified as the cause of death.

### 1. *First Degree Murders by Domino.*

Petitioner Domino argues that because the evidence did not implicate him in the events leading up to the killings and because no witness observed the killings there was a failure of proof of the elements of premeditation and deliberation as to both killings.

Domino also contends that there was no evidence that he was even an aider and abettor in the killing of Hernandez because his actions consisted only of carrying Hernandez into the house, directing his body be wrapped, and telling West to look for a spent shell. He contends that this evidence shows, at most, that he was an accessory after the fact.

Both evidence and reasonable inferences drawn therefrom support the magistrate's contrary conclusions. Mark West testified that Domino was one of several persons who frequented Tapia's residence when he was being detained there. That evidence, coupled with the testimony that Domino directed West to the inside of the motor-home (where he had apparently waited for the victims) to look for a cartridge, raises a strong inference that Domino was involved in the planning. The testimony about his activities from the time he brought Hernandez's body into the house amply confirms the strong inference of his involvement in the perpetration of the crimes.

### 2. *Was Tapia More Than an Accessory After the Fact in the Death of Hernandez?*

Petitioner Tapia also contends that because the evidence did not place him near Hernandez until after he was shot he could not be held even as an aider and abettor in the Hernandez murder. However, the evidence concerning the cartridge search and Tapia's statement that he had been lying in the bushes with his gun support an inference that he was involved in the shooting. That inference was strong enough for a holding order.

### 3. *The Death Penalty as a Cruel and Unusual Punishment for an Aider and Abettor.*

Both defendants point to the fact that Penal Code section 190.2, subdivision (b) permits the death penalty to be imposed upon "[e]very person whether or not the actual killer found guilty of intentionally aiding, abetting, counseling, commanding, inducing, soliciting, requesting, or assisting any actor in the commission of murder in the first degree,"

if certain of the special circumstances exist. They argue that the death penalty is unconstitutional if applied to one who is not the actual killer. They contend that since the evidence presented at the preliminary examination shows at most that each was an accomplice of the other, neither can be subjected to the death penalty.

This contention is prematurely raised. Assuming, but not deciding, that the death penalty could not constitutionally be imposed upon an aider and abettor, it would not follow that the special circumstance allegations should be stricken. These allegations are required for imposition of the penalty of life without possibility of parole, a penalty petitioners do not claim violates the Constitution. (Cf. *People* v. *Superior Court* (*Colbert*) (1978) 78 Cal.App.3d 1023, 1028 [144 Cal.Rptr. 599].) Furthermore, the evidence presented at the preliminary hearing presents a "rational ground for assuming the possibility" that each defendant was the actual killer of each victim. It is true that a finding that both defendants were the *actual killers* of Hernandez might be difficult to sustain. However, at this stage of the proceedings there is no ground for striking the allegation as to either. It is not inconsistent to find a rational ground for assuming the possibility that each defendant fired the lethal shot, though the evidence shows only one lethal wound.

### 4. *The "Lying in Wait" Special Circumstances.*

■ There are several facets to the attacks upon the "lying in wait" special circumstance. Domino argues that there was insufficient evidence as to him because he was not even placed at the scene of the killing until he walked into the house with Hernandez's body. Tapia argues that there was no evidence that he was waiting and watching for either victim or that he was even present at the shooting scene until 15 minutes after Domino walked in with Hernandez's body. He also argues that even if there was watchful waiting, the killing of Reyes was not substantially contemporaneous therewith.

Both defendants ignore the damaging testimony from Mark West, referred to above, that after Hernandez was shot they directed West to locations where expended cartridges might be found. Domino revealed that he was inside the motor-home at the time he fired a shot, while Tapia told West he had been lying in nearby bushes with his gun. This testimony presents a "'rational ground for assuming the possibility'" that both defendants were lying in wait. (See *Ghent* v. *Superior Court* (1979) 90 Cal.App.3d 944, 955 [153 Cal.Rptr. 720].)

A more difficult question is presented concerning the "lying in wait" special circumstance alleged with the Reyes murder charge. Penal Code section 190.2, subdivision (a)(15) provides that the penalty shall be death or confinement for a term of life without the possibility of parole in any case of first degree murder when there has been a finding that "[t]he defendant intentionally killed the victim while lying in wait." Petitioner Tapia focuses upon the word "while" and argues that it creates a requirement of substantial contemporaneity between the lying in wait and the act of killing. He argues that the requirement is not met where the victim is seized and held for an extended period of time before the killing takes place.[1]

The "lying in wait" special circumstance was added to the Penal Code by the 1978 Death Penalty Initiative (Prop. 7, Gen. Elec. (Nov. 7, 1978)). No case interpreting it has been cited by the parties or discovered by this court. The "lying in wait" cases to which the parties refer all arise from use of the terminology in Penal Code section 189. That section provides for an automatic finding of first degree for any murder "which is perpetrated by means of . . . lying in wait . . . ." When the prosecution seeks to prove first degree murder by showing the defendant was lying in wait, the standard instruction provides: "Murder which is immediately preceded by lying in wait is murder of the first degree.

"The term 'lying in wait' is defined as a waiting and watching for an opportune time to act, together with a concealment by ambush or some other secret design to take the other person by surprise. The lying in wait need not continue for any particular period of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation.

"To constitute murder by means of lying in wait there must be, in addition to the aforesaid conduct by the defendant, an intentional infliction upon the person killed of bodily harm involving a high degree of probability that it will result in death and which shows a wanton disregard for human life." (CALJIC No. 8.25.)

---

[1] He briefly asserts that the requirement was not met in the Hernandez killing because there was no proof about how much time elapsed between lying in wait and killing. This assertion ignores West's testimony that he walked into the house, "[h]e sat down on the couch, and [h]e heard a few shots go off." This testimony suggests that Hernandez was killed shortly after his arrival.

Case law concerning the "lying in wait" means for finding first degree murder is sparse. In *People v. Tuthill* (1947) 31 Cal.2d 92, 100 [187 P.2d 16], the Supreme Court noted that there appeared to be no California case precisely defining the phrase "lying in wait," and one commentator has observed that before 1953 there were only six lying in wait murder cases decided in California. (Note, *Murder Committed by Lying in Wait* (1954) 42 Cal.L.Rev. 337, 345, fn. 59.)

The "lying in wait" cases have been concerned primarily with the elements of concealment and watchful waiting, not with the causal relationship between the "lying in wait" and the murders. In *Tuthill, supra*, 31 Cal.2d 92, the defendant went to the cabin of his former mistress, removed a rifle from the wall and concealed it under the covers of a bed. He lay down and fell asleep. When she returned to find him there she awakened him. He brandished the rifle and she fled. She was killed when she returned a few moments later. The *Tuthill* court rejected a claim that concealment in ambush was required to find "lying in wait." It found too that the "lying in wait" did not end when the victim left the cabin and that it was the means through which the defendant accomplished his purpose. (31 Cal.2d 92, 101.)

In *People v. Thomas* (1953) 41 Cal.2d 470 [261 P.2d 1], the defendant carried a rifle under the rear seat of his car and drove around Los Angeles periodically firing at women, allegedly, to achieve an outlet for sexual frustration. On the night of the murder in issue, the defendant saw his victim, a stranger to him, as he drove by in his car. He drove around the block and parked in an alley, where he positioned himself to shoot her. As explained in the concurring opinion by Justice Traynor (41 Cal.2d 470, 475-482), the attacks upon other women permitted an inference of watching and waiting for victims, whereas the stationing in the alley provided the element of concealment.

In *People v. Sutic* (1953) 41 Cal.2d 483 [261 P.2d 241], the defendant was sitting in his car, parked one-third of a mile from the victim's home, when the victims were returning home at 8:10 p.m. While the family was lying in bed 20 minutes later defendant drove up and fired shots through the window, one bullet killing a sleeping child. The *Sutic* court upheld the conviction on both the premeditation/deliberation and lying in wait grounds submitted to the jury.

In *People v. Byrd* (1954) 42 Cal.2d 200 [266 P.2d 505], overruled on other grounds in *People v. Green* (1956) 47 Cal.2d 209, 232 [302 P.2d

307], the defendant waited outside his wife's house for four hours, until her guests had left. He then walked in and immediately shot her. The court found that the evidence justified the lying in wait instruction. Similarly, the instruction was warranted in *People* v. *Rosoto* (1962) 58 Cal.2d 304, 355 [23 Cal.Rptr. 779, 373 P.2d 867], when the defendant waited two hours for the victim to come home and ran up from the side of the house to shoot him when he arrived at 3 a.m. In *People* v. *Harrison* (1963) 59 Cal.2d 622 [30 Cal.Rptr. 841, 381 P.2d 665], the court found sufficient evidence of lying in wait when the defendant attacked the victim with a butcher knife as she emerged from her apartment. He had not been seen on the street prior to the attack and he had called the victim at her apartment one-half hour earlier.

In *People* v. *Ward* (1972) 27 Cal.App.3d 218 [103 Cal.Rptr. 671], the court analyzed the foregoing decisions and concluded that the three required elements for "lying in wait" are watching, waiting, and concealment, but that the concealment "may manifest itself by either an ambush or by the creation of a situation where the victim is taken unawares even though he sees his murderer." (27 Cal.App.3d at p. 230.) In *Ward*, the defendant waited in the car while his associate established that the victim was home. The victim's questions "Who are you?" and "What is this?" when defendant approached the door were sufficient evidence that he was taken unawares.

. In all these cases the killings followed closely after the periods of watching and waiting. By contrast, in *People* v. *Merkouris* (1956) 46 Cal.2d 540 [297 P.2d 999], the evidence showed that the defendant had been sitting in a car near the crime scene between the hours of 9 and 10 in the mornings and 4 and 4:30 in the afternoons almost every day between September 7 and September 18. The killing took place on September 20, a date when he was seen driving his car in the vicinity but when he was not parked in the same spot. The *Merkouris* court found that the "lying in wait" instruction was improperly given: "The killings were not accomplished through defendant's watchful waiting in his car; there was no attempt at either concealment or secrecy; and the killings did not follow on the heels of the watchful waiting." (46 Cal.2d at p. 560.)

While these decisions are instructive about when a murder has been "perpetrated by means of . . . lying in wait," they do not provide guidelines for determining whether the special circumstance of a killing "while lying in wait" exists.

The People argue that in this case lying in wait was the means through which petitioners accomplished their purpose and the fact that Reyes was not killed instantaneously does not lessen the deliberation and premeditation, but heightens them. They suggest that an absurd result would be reached if the lesser penalty were given to one who only wounded his victim while lying in wait and then killed him during a subsequent chase. In effect, the People seek a reading of the special circumstance provision as equivalent to the "lying in wait" provision for first degree murder contained in Penal Code section 189. They argue that because the lying in wait shows premeditation and deliberation and reveals a heinous crime, the death penalty should be imposed regardless of whether the killing takes place during the period when the defendant was lying in wait. They seek judicial deletion of the term "while" from the special circumstance provision.

The voters pamphlet for the November 7, 1978 General Election contains no explanation of why the initiative drafters used the terminology "while lying in wait" instead of the long established phrase "perpetrated by means of . . . lying in wait, . . ." One must assume the drafters were aware of the wording of Penal Code section 189 and that they deliberately chose different words. A contrary assumption would suggest that the drafters exercised little or no care in establishing the criteria for deciding between life and death.

It might be argued that one of the ballot arguments shows that the electorate intended the "lying in wait" special circumstance to be coextensive with the "lying in wait" provision of Penal Code section 189. An argument made in favor of the initiative stated that it was needed "[b]ecause the Legislature's weak death penalty law does not apply to every murderer. Proposition 7 would." If the 1978 initiative measure actually provided for the death penalty for "every murderer" and a strict interpretation of the term "while" in Penal Code section 190.2, subdivision (a)(15) would create a loophole in that scheme, the ballot argument would be persuasive about interpretation of the term "while." However, it is clear that the argument was merely hyperbole. Under no reading of the initiative does it provide for the death penalty eligibility for "every murderer" or even for every first degree murderer.

In *Jones v. Superior Court* (1981) 123 Cal.App.3d 160 [176 Cal.Rptr. 430], this court was confronted with another difference between the wording of a special circumstance provision and the wording

of Penal Code section 189. There, the phrase in section 189 provided that killing "in perpetration of" certain felonies was first degree murder and a body of case law had developed defining the "in perpetration of" phrase as including a period of flight to temporary safety. The special circumstance provided in part for the death penalty for one whose murder was committed while he was "engaged in" the commission of certain felonies. We concluded that the choice of wording was important and that to give the same interpretation of the terms "while engaged in" and "in perpetration of" would violate "the 'policy of this state to construe a penal statute as favorably to the defendant as its language and the circumstances of its application may reasonably permit; ....' (*Keeler* v. *Superior Court* (1970) 2 Cal.3d 619, 631 ....)" (*Jones, supra*, 123 Cal.App.3d 160, 170-171.) There, the special circumstance phrase read, "while the defendant was engaged in ... the commission ... or the immediate flight after committing." Thus, the Legislature had used a combination of "while the defendant was engaged in" and "the immediate flight after committing" to create the same meaning the cases had given to the phrase "in perpetration of."

Here, similarly, to ignore or minimize the importance of the word "while" would violate the policy of construing penal statutes in favor of the accused and would invade the legislative province. To give proper impact to the term "while" we read it as creating a requirement that where first degree murder has been "perpetrated by means of ... lying in wait," the death penalty or life without possibility of parole may be imposed only if the appropriate temporal relationship exists between the killing and the lying in wait. "While" is defined as "during the time that" or "during which time: and during the same time: and meanwhile." (Webster's Internat. Dict. (3d ed. 1961) p. 2604.) ■ Thus, the killing must take place during the period of concealment and watchful waiting or the lethal acts must begin at and flow continuously from the moment the concealment and watchful waiting ends. If a cognizable interruption separates the period of lying in wait from the period during which the killing takes place, the circumstances calling for the ultimate penalty do not exist.[2]

---

[2]It is our function to interpret and apply the law, not to amend it as a legislative body might. The dissent suggests that we are requiring expert semantics by the drafters of the initiative. We are requiring nothing of the sort. We are merely applying accepted definitions for terms which are neither obscure nor ambiguous in the context used. If we were to delete the word "while" merely because we might have preferred that the drafters employ different phraseology, we would be setting ourselves up as legislators. We are bound by the plain meaning of the words used.

■ Here, where victim Reyes was captured during the period of lying in wait and was killed some one to five hours later, the special circumstances clearly do not exist. Therefore, the superior court erred in failing to dismiss them.

Let a peremptory writ of prohibition issue restraining all further proceedings on the special circumstance allegations that Louis Reyes was killed while defendants were lying in wait, other than the dismissal of the allegations. In all other respects the two petitions are denied.

Feinberg, J., concurred.

**BARRY-DEAL, J.**—I concur in that portion of the decision denying the petitions in part, but disagree with striking the special circumstance allegations that Louis Reyes was killed while defendants were lying in wait.

Although the complete text of the special circumstance provision uses the terminology, "[t]he defendant intentionally killed the victim while lying in wait," the operative words are "intentionally killed" and "lying in wait." The intent of the initiative proponents was to make the new death penalty law (Pen. Code, § 190.2) applicable to types of murder which had not been covered by the prior law, one of which was murder "perpetrated by means of . . . lying in wait" (Pen. Code, § 189). The mere happenstance that the word "while" was used to designate a "lying-in-wait" murder does not reveal an intention that a different body of law arise under the "lying-in-wait" special circumstance.

The majority's conclusion is particularly troubling because legislation passed by initiative may not be amended or repealed except by a vote of the electors "unless the initiative statute permits amendment or repeal without their approval." (Cal. Const., art. II, § 10.) Although the death penalty initiative provides for severability, it does not empower the Legislature to amend its provisions to correct for limiting judicial constructions. Thus, to change the word "while" to "by means of" would require a new initiative. Where, as here, the purpose of the initiative is clear and does not violate the federal or state Constitution, the people of the State of California should not be thwarted by requiring expert semantics. (Cf. *Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582, 591 [135 Cal.Rptr. 41, 557 P.2d 473, 92

A.L.R.3d 1038]; *Teachers Management & Inv. Corp.* v. *City of Santa Cruz* (1976) 64 Cal.App.3d 438, 448-449 [134 Cal.Rptr. 523].)

I would deny the petitions in their entirety.

A petition for a rehearing was denied April 13, 1982. Barry-Deal, J., was of the opinion that the petition should be granted. The petition of the real party in interest for a hearing by the Supreme Court was denied May 26, 1982. Broussard, J., did not participate therein. Richardson, J., was of the opinion that the petition should be granted.