
[No. A057032. First Dist., Div. Five. May 13, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
BENJAMIN PADAYAO, Defendant and Appellant.

**[Opinion certified for partial publication.†]**

†Pursuant to California Rules of Court, rule 976.1(a), this opinion is certified for publication with the exception of section II.A. and sections II.C. through II.G.

**COUNSEL**

Fern M. Laethem, State Public Defender, and Michael J. Hersek, Deputy State Public Defender, under appointments by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Ronald E. Niver and Catherine A. Rivlin, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**PETERSON, P. J.**—Appellant Benjamin Padayao was convicted of the torture murder of a victim, and was sentenced to life without possibility of parole. He contends: (1) The trial court's rulings on the proper scope of cross-examination violated his constitutional rights to cross-examine four witnesses, and to present a defense to the charges; (2) there was insufficient evidence to support the jury's finding of the applicability of the lying-in-wait special circumstance; (3) the trial court erred when it allowed the prosecution to present evidence that the motive for the crime was related to the victim's opposition to appellant's drug dealing, and that appellant provided drugs to his fellow murderers in order to obtain their cooperation in the murder; (4) the trial court should have barred evidence of a remark by appellant which indicated he wished to perpetrate another, uncharged murder; (5) the trial court erred in admitting evidence concerning the sadistic message written on the shirt appellant was wearing when he was arrested; (6) the jury instructions on diminished capacity were erroneous; and (7) the trial court should not have admitted into evidence certain grisly photographs showing the injuries inflicted on the body of the victim of the torture murder.

We find no prejudicial errors, and affirm the conviction.

I. FACTS AND PROCEDURAL HISTORY

Appellant was angry with the victim, because the victim had objected to appellant's furnishing cocaine to one of the employees who worked near the

victim at the San Francisco airport; appellant said the victim had "embarrassed" appellant in front of his friends. Appellant's friend Dionisio Deudor also suspected the victim was intimate with Deudor's estranged wife, or would know who she was seeing. Appellant, Deudor, and four young men (one of whom was Deudor's nephew) proceeded to attack the victim and torture him to death.

Appellant and his companions procured a semiautomatic firearm, yellow rubber gloves, and smoked a lot of rock cocaine while planning the crime. Then they lay in wait for the victim, parking near the house where he was staying and waiting for him to drive past.

When the victim drove by, appellant and his companions followed in a car. They honked and signalled for the victim to stop, and told a story about having car trouble. The victim was brought to appellant's house in Daly City and beaten; he was crying.

What follows is not easy reading. Deudor began interrogating the victim about the supposed affair between him and Deudor's wife. Appellant assisted the interrogation by kicking the victim, kneeing him in the face, and then dragging him up the stairs by the back of his shirt. Appellant and some of the other attackers wore yellow rubber gloves.

During hours of interrogation the victim was continuously beaten by appellant, Deudor, and the four young men. Appellant discussed giving the victim a cigarette, but then kicked the victim hard in the ribs when he asked for the cigarette in a "proud" way. Appellant smiled and said, " 'I think I broke one of [his] fucking ribs.' " Appellant also told the victim, "this is your last day to drink and smoke because you are going to die."

The victim told the interrogators the name of a man he claimed was the lover of Deudor's estranged wife.

Appellant came into the room where the victim was being interrogated, carrying an extension cord, and told the victim, "We're going to kill you." He put the cord in a noose and told the victim to hang himself. The young men were told to kill the victim using the cord, because a gun would make too much noise. They dragged the victim around the room with the cord tight around his neck, while singing the alphabet and playing tug of war with the extension cord wrapped around the victim's neck. Then appellant grabbed the cord and stood on the back of the victim's neck while pulling tightly on the cord. He stomped on the victim's stomach, in order to "get the air out." At some point, appellant picked up a wooden club and hit the victim in the

back of the head. Appellant and one of the young men also tried to break the victim's neck, and appellant tied a plastic bag over the victim's head to smother him.

Appellant, Deudor, and the four young men put the victim's body in the trunk of a car. Appellant and the young men then drove to Oakland, where appellant bought rock cocaine for himself and the young men. They stopped to eat in a restaurant in Berkeley, with the victim's body still in the trunk. They drove around for a while, and then after dark dumped the victim's body into a trash pile.

The murderers burned the victim's car, and went back to Oakland for more crack cocaine to smoke; they drove to Pier 39 in San Francisco to smoke the crack together. Appellant then asked one of the young men if he could borrow his semiautomatic weapon, saying that " '[M., the alleged lover of Deudor's estranged wife,] lives around here.' "

About two weeks later, the police had arrested one of the young men in connection with a freeway shooting, and were looking for his semiautomatic weapon in appellant's house. Appellant gave the police permission to search. Three informants, who had heard boasting about the victim's killing, contacted police with information implicating appellant.

Appellant initially told the police he had an alibi. Then appellant blamed the young men for the killing, but said he helped to dispose of the body. Later, appellant admitted hitting the victim, striking him on the back of the head with a stick, entering the interrogation room with the extension cord, and watching the strangulation and killing. While appellant was in jail, money was also sent to him by Deudor, who escaped the police. Appellant told one of the young men that if appellant were going to do it over again, he would just stab the victim in the parking lot of the airport after work. He also said that he would have carried out the killing more quickly, so that it would not have taken so much time for the victim to suffer and die.

The young men entered guilty pleas pursuant to plea bargains which allow them the possibility of parole; their testimony at appellant's trial showed appellant was one of the leaders and instigators of the killing, together with Deudor. A pathologist testified concerning the multiple and painful injuries suffered by the victim, which caused the victim to suffer considerably before his death. The pathologist was unable to say from forensic evidence exactly when the victim became unconscious; the pathologist could not from his

examination exclude the possibility that the victim might have become unconscious from a blow to the head.

Appellant called a psychiatrist, who testified for the defense that appellant suffered from multiple "disorders" or other mental conditions which had prevented him from forming the intent necessary for first degree murder, such as "[l]ow self-esteem," depression, rejection by his wife, more or less constant cocaine abuse, resulting sleep problems, a lack of "self-confidence," and so on. On cross-examination, the expert was asked about evidence indicating appellant's wife had rejected and left him after he beat her and threatened her with a razor, because he thought she was having an affair with another man.

The jury found appellant guilty of first degree murder and conspiracy to commit murder, and found true the special circumstance allegations that the murder had been perpetrated while lying in wait, and by torture.

The trial proceeded to a penalty phase in which the prosecution sought the death penalty. However, after the jury deadlocked on the question of penalty, the court declared a mistrial as to the penalty phase. The prosecution elected not to retry the penalty phase. The court denied appellant's motion to strike the special circumstances, and specifically noted that appellant "was a ring leader in the perpetration of this heinous crime." The court, therefore, imposed the statutory sentence of life without possibility of parole.

## II. DISCUSSION

We find no prejudicial errors or violations of appellant's constitutional rights, and affirm the judgment of conviction.

### A. *Scope of Cross-examination Issues**

. . . . . . . . . . . . . . . . . . . . . . . . . .

### B. *Sufficiency of the Evidence for the Lying-in-wait Special Circumstance*

■ Relying on *Domino v. Superior Court* (1982) 129 Cal.App.3d 1000 [181 Cal.Rptr. 486] (*Domino*), appellant challenges the sufficiency of the evidence to support the lying-in-wait special circumstance (Pen. Code,

---

*See footnote, *ante*, page 1610.

§ 190.2, subd. (a)(15)). He argues, "Because the lethal acts of strangulation which ended [the victim's] life were preceded by hours of non-lethal action, the special circumstance of lying-in-wait does not exist in this case as a matter of law, and must be stricken." The contention is meritless.

■ To constitute a lying-in-wait special circumstance under Penal Code section 190.2, subdivision (a)(15), the defendant must intentionally kill the victim "*while* lying in wait." (Italics added.) In *Domino*, a divided panel of Division Three of this court construed the term "while" to mean that ". . . the killing must take place during the period of concealment and watchful waiting *or the lethal acts must begin at and flow continuously from the moment the concealment and watchful waiting ends*. If a cognizable interruption separates the period of lying in wait from the period during which the killing takes place, the circumstances calling for the ultimate penalty do not exist." (129 Cal.App.3d at p. 1011, fn. omitted, italics added.)[1]

■ On facts very close to those in the case at hand, our Supreme Court found the second prong of the *Domino* rule to be satisfied in *People v. Morales* (1989) 48 Cal.3d 527, 558 [257 Cal.Rptr. 64, 770 P.2d 244] (*Morales*).[2]

In *Morales*, the defendant and his accomplice lured the victim to his car where he attempted to strangle her with his belt until it broke; repeatedly beat her on the head with a hammer; dragged her body to a field where he committed an act of forcible sexual intercourse; and stabbed her four times in the chest, which ultimately killed her. (48 Cal.3d at p. 541.) On this record, the high court did not hesitate to conclude that the jury could reasonably find that the defendant's lethal acts "flowed continuously from the moment he commenced his surprise attack." (*Id.* at p. 558.) It made no difference that the initial attacks proved ultimately to be nonlethal: "Although [the victim] evidently survived defendant's initial attempt to strangle and beat her to death, no 'cognizable interruption' occurred between the period of watchful waiting and the commencement of the murderous *and continuous* assault which ultimately caused her death." (*Ibid.*, italics in original.)

---

[1]CALJIC No. 8.81.15 (1989 rev.) essentially tracks this language and advises the jury: "If there is a clear interruption separating the period of lying in wait from the period during which the killing takes place, so that there is neither an immediate killing nor a continuous flow of the uninterrupted lethal events, the special circumstance is not proved."

[2]In so doing, the court left for another day consideration of the "validity" of what it termed as "*Domino*'s restrictive interpretation" of the lying-in-wait special circumstance provision. (*Morales, supra,* 48 Cal.3d at p. 558.)

We can discern no meaningful difference between the facts in *Morales* and those in the case at hand. In our view, the jurors could reasonably conclude from the evidence before them that the lethal acts commenced immediately with the victim's capture, and that they flowed continuously through the interrogation and assaults at the house, including the kicking, the kneeing in the face, the dragging upstairs, the kicking in the ribs, the tugging with the electrical cord around his neck, the stomping on his stomach, the beating with the wooden club, the attempts to break his neck, and the tying of the plastic bag over his head, which ultimately caused his death. *Morales* does not require that the initial assaults be proven lethal.[3]

Appellant's contentions based upon the majority opinion in *Domino* are, thus, misplaced here. ■ Our function on review is not to try the case de novo, but simply to ascertain whether the jury's determination is supported by any substantial evidence. (*People* v. *Ceja* (1993) 4 Cal.4th 1134, 1138 [17 Cal.Rptr.2d 375, 847 P.2d 55].) "The role of an appellate court in reviewing the sufficiency of the evidence is limited. The court must 'review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*Ibid.*, quoting *People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].)

■ The trial court did not err in instructing the jury on the special circumstance, and substantial evidence supports the jury's finding that appellant killed the victim while lying in wait.

C.-G.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[3]Appellant's reliance on other language from *Domino* is also misplaced. The *Domino* majority capped its discussion as follows: "*Here, where* [the victim] *was captured during the period of lying in wait and was killed some one to five hours later*, the special circumstances clearly *do not exist*." (129 Cal.App.3d at p. 1012, italics added.) To the extent *Domino* can be read as appellant does—namely, that a cognizable interruption occurs *as a matter of law* where there is a passage of time between the capture and death of the victim—then we must respectfully disagree with that conclusion. Certainly that is not the view of the California Supreme Court, as *Morales* makes clear. Moreover, the conclusion is nonsensical. As its own rule makes clear, the focus is not upon when death actually occurs, but whether there has been a continuum of physically harmful acts from the period of concealment to the commencement of the assault which ultimately causes death. (*Id.*, 48 Cal.3d at p. 558.) As we read the facts of *Domino*, they fit that test.

*See footnote, *ante*, page 1610.

III. DISPOSITION

The judgment of conviction is affirmed.

King, J., and Poché, J.,* concurred.

A petition for a rehearing was denied June 9, 1994, and appellant's petition for review by the Supreme Court was denied August 18, 1994.

---

*Associate Justice of the Court of Appeal, First District, Division Four, sitting under assignment by the Chairperson of the Judicial Council.