Filed 5/19/26  P. v. Zacarias CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>OSVALDO ZACARIAS,<br><br>    Defendant and Appellant. | E084610<br><br>(Super.Ct.No. RIF1903932)<br><br>**ORDER MODIFYING OPINION**<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT

The opinion filed in this matter on May 8, 2026, is modified as follows:

On page 1, "Affirmed with directions" is modified to read:  "Affirmed in part, vacated in part, and remanded with directions."

On page 19, the following sentence is added between the first and second sentence of the Disposition:  "The matter is remanded with directions to the trial court to dismiss that prior enhancement and to prepare an amended abstract of judgment and forward it to the California Department of Corrections and Rehabilitation."

1

The Disposition, therefore, should read as follows:

"The prior serious felony enhancement based on the May 31, 1990 conviction for shooting at an occupied vehicle or dwelling is vacated. The matter is remanded with directions to the trial court to dismiss that prior enhancement and to prepare an amended abstract of judgment and forward it to the California Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed."

This modification does not change the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS _____
J.

We concur:

MILLER _____
Acting P. J.

RAPHAEL _____
J.

Filed 5/8/26  P. v. Zacarias CA4/3 (unmodified opinion)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E084610 |
| v. | (Super.Ct.No. RIF1903932) |
| OSVALDO ZACARIAS, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Samah Shouka, Judge.

Affirmed with directions.

Theresa Osterman Stevenson, under appointment by the Court of Appeal, for

Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney

General, Charles C. Ragland, Assistant Attorney General, Christopher P. Beesley and

Kristen Kinnaird Chenelia, Deputy Attorneys General, for Plaintiff and Respondent.

1

# INTRODUCTION

Defendant Osvaldo Zacarias snuck into his wife's car while she was at work, then shot and killed her from the back seat as she drove out of the parking lot at the end of her shift. During the incident, Zacarias also shot and injured a coworker who tried to come to his wife's aid. A jury found Zacarias guilty of one count of attempted murder (Pen. Code, §§ 187, subd. (a), 664[1]) and one count of first degree murder with a true finding on the lying-in-wait special circumstance allegation (§§ 187, subd. (a), 190.2, subd. (a)(15)). The jury also found true that he personally and intentionally discharged a firearm and caused great bodily injury during the commission of both counts. (§ 12022.53, subd. (d).) The trial court sentenced Zacarias to life without the possibility of parole plus 96 years to life, which included three five-year prior serious felony enhancements. (§ 667, subd. (a).)

On appeal, Zacarias argues: (1) the trial court erred by failing to instruct the jury on the "heat of passion" theory of attempted voluntary manslaughter (§ 192, subd. (a)); (2) the lying-in-wait special circumstance is not supported by substantial evidence; and (3) one of the three prior serious felony enhancements should be vacated because the underlying conviction was tried in the same case as one of the other two underlying convictions and therefore does not qualify as a separate conviction within the meaning of section 667, subdivision (a). We agree with the last contention only. We therefore vacate one of the prior serious felony enhancements but otherwise affirm the judgment.

---

[1] Unlabeled statutory citations refer to the Penal Code.

BACKGROUND

A. *Prosecution's Evidence*

Zacarias and his wife, Judy Zacarias,[2] were married for 33 years and had six children together, all between the ages of 15 and 25.  In May 2019, Judy filed for divorce, and in August of that same year, Zacarias rented an apartment.

The shootings occurred at approximately 4:00 a.m. on September 23, 2019, just after Judy completed her night shift at a warehouse in Moreno Valley.  At trial, the People presented excerpts of Zacarias's phone records, which showed that in the 24 hours leading up to the shooting he was frequently calling and texting his wife and procuring a gun.

Shortly before 6:00 a.m. on September 22, 2019, Zacarias called Judy.  Around 10:00 a.m., they spoke for about 80 minutes, and then again for about 15 minutes, ending the second conversation at about 11:30 a.m.

About thirty minutes later, Zacarias searched online for " '.38 revolver gun price.' "  He then texted someone named Alfred to let him know that he had the money for the firearm (the "toy") he had inquired about the day before.  Alfred gave Zacarias the number for a person called "Munchy," and Zacarias texted Munchy that he was interested in purchasing a gun from him.

At 6:23 p.m., Zacarias texted Judy, " 'I can't handle this hurt.' "  Judy responded, " 'I'm sorry.  Let time heal.  Everything hurt too.  Everything is happening for a good

---

[2]  Because the defendant and the victim share the same last name, we refer to the victim by her first name to avoid confusion.  No disrespect is intended.

3

reason.' " Zacarias replied, " 'You don't give a fuck. I don't either.' " Judy then replied, " 'I do care. This is why I told you I was going to do good. I guess I'm stronger because I didn't react to you the times you hurt me. I stood strong. But look at you, you're showing weakness and acting like this. You didn't go to work.' "

About an hour after that, Munchy texted Zacarias telling him to come to his home on " 'Clover.' " About 15 minutes later, at approximately 7:45 p.m., Zacarias's phone pinged from a cell tower in Ontario, near a street called Clover Place, and remained in that area for almost five hours, until 12:30 a.m.

Zacarias and Judy had several exchanges while Zacarias was in Ontario. At around 8:00 p.m., Judy asked Zacarias to call her, and he texted her that he was " 'kicking it' " with his " 'homies.' " When she again asked him to call her, he responded, " 'No. You live your life, I live my life.' " Judy called Zacarias, but he did not answer. At 8:42 p.m., he texted, " 'You're not going to get the last laugh.' " Judy replied, " 'I'm not. I don't ever wan[t] to hurt you. I'm not, so please don't think like this.' " Zacarias responded, " 'No, just let me alone. You push me this way.' "

Just before 9:00 p.m., Zacarias wrote, " 'Judy, you hurt me so much. I think I know what to [do] from this day on.' " Then he texted, " 'I'm taking care of some business,' " and " 'Let that fool comfort you.' " He then placed a call to Judy but immediately hung up and texted, " 'You're with him' " and " 'Bitch, n[o]w you don't want to text.' " He placed two more unanswered calls to Judy, and she responded by text, " 'You need to cool down.' "

4

Zacarias continued to call Judy and text her about being with another man. Judy eventually texted, " 'I'm not with anyone!! So fucking leave it alone. This is why I couldn't be with you and your jealousy.' " Zacarias continued to harass her and asked for a photo of the other man, saying, " 'I'm putting a green light on him' " and repeating that he was not going to let her get the last laugh. Judy told him to grow up and to stay away from their children. Zacarias responded, " 'Okay. You will see. If I was you, need to calm down before it [gets] worse because you will lose. I don't give a fuck.' " Judy replied that she was going to show their text conversation to the police, Zacarias's lawyer, and " 'everyone that has faith in you.' "

Between 11:30 p.m. and 1:00 a.m. the following day (September 23), Zacarias called Judy dozens of times and sent threatening text messages. At one point, he texted her, " 'Whatever. But reality, I don't give a fuck about the law. I show it to the hommies [sic] that you will show it to the cops. I gave them Paul's address and your family's.' " He then texted, " 'Just send me a picture of him. Don't make it har[d] because you're [a] fuck[ing] rat anyways.' " Later, Zacarias asked Judy if she was going to " 'snitch' " on him to the cops, warning, " 'I'm asking you one more time.' "

At 1:03 a.m., after a series of unanswered calls from Zacarias, Judy texted, " 'I told you not to mess with me. I wanted to handle this [professionally,] this divorce, but you couldn't handle it. This had nothing to do with a guy. It had to do with the abusive attitude of your jealousy. At this point, don't call me, please.' " Zacarias continued to call her. Over the course of the day leading up to the shooting, he called her a total of 56 times; she called him three times.

At about 3:15 a.m., Zacarias drove to the warehouse in Moreno Valley, where Judy was close to finishing her night shift, which started at 6:00 p.m. and ended at 4:00 a.m. Surveillance footage from the warehouse showed Zacarias park his truck outside of the parking lot, walk into the lot, and enter Judy's car through one of the driver's side doors.

Judy's coworker, Christina C., testified that she was working the night shift with Judy that evening. She got into her car, an SUV, after her shift ended and drove toward the parking lot exit, where two cars were already in line to leave. She heard a loud popping noise and then saw the front driver's side door of the first car fling open. Thinking that one of the car's tires had popped, Christina pulled her SUV up next to the car, alongside the driver's side, to see if she could help. Through the open driver's side door, Christina could see that the driver, who was a woman, was slumped over the center console.

Christina rolled her passenger window down and asked if the driver was okay. A man stepped out of the rear driver's side door, and Christina recognized him as Zacarias, one of the union representatives with whom she was familiar. Christina asked Zacarias if everything was okay, and he responded, " 'She's fine. She's okay.' " But when Christina looked back at the woman in the driver's seat, "everything in [her]" told her that "nothing was okay." Just then, Zacarias shot the woman in the back. He then turned to face Christina, raised the gun to her head, and fired through the open window at close range. Christina reflexively threw up her right hand to cover her face, and the bullet struck her ring finger, breaking it in more than three places. Worried that her workplace was under

6

the attack of an active shooter, Christina sped out of the parking lot, parked a safe distance from the shooter, and ran back inside the lobby to warn her coworkers.

The surveillance footage captured the shooting at the parking lot exit and corroborated Christina's account. The footage shows Christina's car get in line one car behind Judy's, then pull up next to Judy's, and, a short time later, drive away. In the video, the space between the two cars where Zacarias would have been shooting from is obscured by a tree.

When the police and medical team arrived on the scene, Judy was already dead. She had sustained two gunshot wounds to her back. One of the bullets had been fired at close range within an inch of her body. It traveled through her back and hit her heart and one of her lungs. The other bullet travelled through her back and hit her spine.

Several hours after the shooting, Zacarias drove to the police station and turned himself in. In his police interview, he said that he suspected that Judy was having an affair with one of her coworkers. He did not know who the coworker was, but he thought his name might be Francisco. Zacarias said that in the hours leading up to the shooting, someone was calling him repeatedly, pretending to be a cop, and that he suspected the caller was Francisco. He also said that Judy had been calling him and telling him that he was a "loser." After purchasing a gun in the San Gabriel Valley, Zacarias hung out there and drank until he "kind of blacked out." When he left, sometime after midnight, he felt that "everything was just piling up" and he "just wanted to talk to her." He drove to the warehouse and waited in Judy's car for over an hour until her shift was over.

When Judy entered her car, he "took out the gun" and said "let's just go talk." She asked him what he was planning to do with the gun, and they started arguing. Zacarias said: "We were arguing in the car, and then I just told her look, drive, and then the next thing I know I shot her in the leg . . . , and that's the only thing I remember. I just shot her in the leg."

Later in the interview, Zacarias said that he shot Judy in the leg after another car pulled up beside them and Judy opened her door and tried to get out. After the shooting, he drove to his house and told his kids what he had done. He told them that he "messed up" and "I hurted [sic] your mom." When his daughter asked him why, he said, "I couldn't take it anymore."

Zacarias told the police that everything Judy had said and done to him, "it just built up" and that he "wanted to show her that . . . I had enough." He admitted that he shot Judy on purpose, saying, "I'm not gonna sit here and say it was an accident."

B. *Defense Case*

Zacarias testified in his own defense and contradicted many of his statements to the police. For example, he said that it was Ontario (not the San Gabriel Valley) where he had purchased the gun and hung out for hours; that he went to the warehouse to confront Francisco for having an affair with his wife (not to talk to Judy); and, most significantly, that the first shot had been accidental, the result of a struggle over control of the gun.

Zacarias told the jury that he never intended to kill Judy. He said that he drove to the warehouse and waited inside Judy's car to confront Francisco, even though he did not

8

know who he was or what he looked like.  Zacarias said that he fell asleep in the back seat of Judy's car while waiting for her shift to end and woke up when she started the ignition.  She was texting and laughing as she pulled her car out of the parking spot.  When she noticed him in the back seat, she put the car in park and turned around.

Zacarias sat up to see why she stopped the car, and in doing so, placed the gun on the center console.  Judy grabbed the gun and "put it on herself" and started crying.  He tried to get the gun from her, and as they were wrestling for it, her phone began to ring.  They both reached for the phone, which caused the gun to fire.  Zacarias testified that it was his finger that had pulled the trigger, but he said that he did not mean to do it, that it was an accident.  After the gun went off, he asked Judy, "Why did you do this?" and he decided to leave.

Zacarias told the jury that, as soon as he got out of the car, "everything just started just spinning in my head, like voices. . . .  [T]he hurt, the pain, and I just turned around and shot her again."  When asked why he shot Christina after he shot Judy the second time, he said, "I just remember a car pulling right next to me and screaming.  And I just . . . I don't know if I shot or what."  He said that he is blind in his left eye and did not even see Christina—"I didn't even see her face.  I don't remember her. . . .  [¶]  I just seen lights."

On cross-examination, Zacarias agreed that the fact that Judy wanted a divorce was not "heartbreaking" for him.  He said that he tried to make their marriage work only because "I went and spoke to a lawyer . . . , and he advised me to try to work it out because I was going to lose everything."  But Judy was "making it difficult" for him

"[f]inancially," and "[e]verything was just piled up, and work and me taking care of the kids, college, taking them to school. Everything was just piling up."

During closing argument, defense counsel asked the jury to believe the account that Zacarias gave during his police interview over his trial testimony because the interview was closer in time to the shooting and thus the events were more fresh in his mind. Counsel argued that the first shot Zacarias fired was not the product of premeditation and deliberation but was instead "voluntary manslaughter because of what we call heat of passion." Counsel did not identify how Judy provoked Zacarias, but counsel argued that Zacarias's trial testimony describing the first shot did not make sense. "Could you shoot somebody in the back by accident? Or does it not make any sense?" Counsel also argued that Zacarias was not guilty of the attempted murder of Christina because the shooting was "a kind of reflex action" that Zacarias did not even remember.

C. *Verdict and Sentencing*

The jury found Zacarias guilty of the first degree murder of Judy and the attempted murder of Christina. (§§ 187, subd. (a), 664.) As to the murder, the jury found true the special circumstance allegation that Zacarias "intentionally killed [Judy] by means of lying in wait." (§ 190.2, subd. (a)(15).) As to both counts, the jury found that he personally and intentionally discharged a firearm, causing great bodily injury. (§ 12022.53, subd. (d).)

Before trial, Zacarias pled guilty to being a felon in possession of a firearm. (§ 29800) After trial, he admitted to having three prior serious felony convictions (§ 667,

10

subd. (a)) and three prior strike convictions (§ 667, subds. (c), (e)(2)(a)).  The trial court sentenced Zacarias to life without the possibility of parole plus 96 years to life.

DISCUSSION

A.  *Instruction on "Heat of Passion" Attempted Voluntary Manslaughter*

Zacarias argues that the trial court erred by failing to give the jury an attempted voluntary manslaughter instruction as a lesser included offense of attempted murder.  We disagree.  The record contains no evidence that Christina did anything that would constitute provocation.

Heat of passion is a theory of " 'partial exculpation' " that reduces murder or attempted murder to manslaughter or attempted manslaughter by negating the element of malice.  (*People v. Moye* (2009) 47 Cal.4th 537, 549 (*Moye*).)  The theory applies to reduce attempted murder to attempted voluntary manslaughter when the defendant attempts an unlawful killing, without malice, "upon a sudden quarrel or heat of passion." (§§ 192, subd. (a), 664.)  The theory requires that the defendant's "reason was actually obscured as the result of a strong passion aroused by a 'provocation' sufficient to cause an ' "ordinary [person] of average disposition . . . to act rashly or without due deliberation and reflection, and from this passion rather than from judgment." ' "  (*People v. Breverman* (1998) 19 Cal.4th 142, 163 (*Breverman*), overruled in part on other grounds by *People v. Schuller* (2023) 15 Cal.5th 237, 260, fn. 7.)

"Heat of passion has both objective and subjective components.  Objectively, the victim's conduct must have been sufficiently provocative to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection."  (*People v.*

11

*Enraca* (2012) 53 Cal.4th 735, 759.)  "Subjectively, 'the accused must be shown to have killed while under "the actual influence of a strong passion" induced by such provocation.' "  (*Ibid.*)

Attempted voluntary manslaughter is a lesser included offense of attempted murder.  (*People v Gutierrez* (2003) 112 Cal.App.4th 704, 708-709; see also *People v. Williams* (1988) 199 Cal. App. 3d.469, 475.)  The "trial court must instruct on a lesser included offense if substantial evidence exists indicating that the defendant is guilty only of the lesser offense."  (*People v. Manriquez* (2005) 37 Ca1.4th 547, 584 (*Manriquez*).)  " 'Substantial evidence' " is evidence from which a reasonable juror could conclude "that the lesser offense, but not the greater, was committed."  (*Breverman*, *supra*, 19 Ca1.4th at p. 162.)  When determining whether evidence is substantial, in this context, a court determines only the bare legal sufficiency of the evidence, not its weight, and thus does "not evaluate the credibility of witnesses."  (*Breverman*, at pp. 162, 177).  We independently review whether the trial court should have instructed on a lesser included offense.  (*Manriquez*, at p. 584.)

At trial, the evidence of Christina's conduct toward Zacarias was undisputed.  She pulled her car up next to Judy's and yelled through her open window at Zacarias, asking if everything was okay.  Zacarias argues that this conduct warrants a heat of passion instruction because Christina provoked him to shoot her by "screaming" at him.  The argument is flawed, both as a matter of law and of public policy.  It is true that "[t]he provocative conduct by the victim may be physical or verbal" (*Manriquez*, *supra*, 37 Ca1.4th at p. 583) and that the passion aroused in the defendant need not be anger, but

12

can be any " ' " '[v]iolent, intense, high-wrought or enthusiastic emotion' " ' " (*Breverman*, *supra*, 19 Ca1.4th at p. 163). However, the sheer act of raising one's voice at a person—Zacarias claims to have no idea what Christina said—is not legally sufficient provocation to arouse such violent or intense emotions. Otherwise, no one would risk coming to a victim's aid, as Christina did here, and some criminals would be incentivized to kill the witnesses to their crimes. This is especially true here, where the victim of the attempted murder did nothing more than check to see if everyone in the murder victim's car was okay after observing unusual activity.

But even if yelling at a person could constitute legally sufficient provocation in the abstract, in this case, Zacarias's testimony forecloses a heat of passion theory. At trial, Zacarias told the jury that he was in such a state of confusion and emotional turmoil *from shooting his wife* that he did not even remember shooting at Christina. Thus, if anything provoked the third shot, it was his own conduct or his argument with Judy, certainly not anything that Christina did.

During a discussion regarding jury instructions, the prosecutor informed the court that both sides had agreed that the record did not support a heat of passion attempted voluntary manslaughter instruction. Defense counsel confirmed the prosecutor's position, explaining that, although attempted voluntary manslaughter was a lesser included offense of attempted murder, "for tactical reasons," "I don't want to argue that to the jury because it could have a detrimental affect on my credibility." On appeal, Zacarias argues that his counsel provided ineffective assistance by failing to request the

13

instruction. We reject the argument. As explained, there was no evidence to support the instruction and, as a result, counsel was not ineffective in choosing not to request it.

B. *Lying-In-Wait Special Circumstance*

Next, Zacarias argues that the record does not contain substantial evidence to support the jury's true finding on the lying-in-wait special circumstance allegation. Again, we disagree.

Faced with a challenge to the sufficiency of the evidence, " 'we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value— from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Cravens* (2012) 53 Cal.4th 500, 507.) We do not resolve credibility issues or evidentiary conflicts, as that is "the exclusive province of the trier of fact." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) Instead, we uphold the conviction " 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." ' " (*Cravens*, at p. 508.)

"The ' "lying-in-wait special circumstance requires ' " 'an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) . . . a surprise attack on an unsuspecting victim from a position of advantage . . . .' " ' " ' " (*People v. Parker* (2022) 13 Cal.5th 1, 58, internal quotation marks omitted; § 190.2, subd. (a)(15).)

14

We conclude that the record contains substantial evidence to satisfy each element. From the evidence that Zacarias sent Judy threatening texts and then purchased and armed himself with a gun before hiding in her back seat, the jury could reasonably find that he intended to kill Judy and concealed his lethal purpose from her. From the evidence that he waited in the back seat for almost an hour for her to finish her work shift, the jury could reasonably find that he waited for a substantial period of time for an opportune time to act. And finally, from the evidence that he shot her in the back, from a position behind her in the car, the jury could reasonably conclude that the shooting was a surprise.

Zacarias contends that the record does not support the element of surprise because the evidence showed that some time had passed between when Judy noticed Zacarias in the back seat and when he fired the first shot. To support this argument, he points to his testimony describing the conversation that he and Judy had before he shot her and to Christina's testimony that Judy was the first car in line to leave the lot when she heard the first popping sound and saw Judy's door open. According to Zacarias, the moments between Judy discovering him and the shooting constitute "an interruption separating the period of waiting and the killing such that" the special circumstance does not apply. We are not persuaded.

The two cases that Zacarias relies on to argue that the killing must occur immediately after the lying in wait, *People v. Nieves* (2021) 11 Ca1.5th 404 (*Nieves*) and *People v. Hajek and Vo* (2014) 58 Cal.4th 1144 (*Hajek*), are unhelpful because they involved an earlier version of the special circumstance, which required that the killing

15

occur " 'while' " the defendant was lying in wait (*Nieves*, at p. 465, overruled in part by *People v. Rangel* (2016) 62 Cal.4th 1192, 1216; *Hajek*, at p. 1184). But, as our Supreme Court explained in *Hajek*, "In 2000, the electorate approved Proposition 18 which, among other things, 'changed the language of the lying-in-wait special circumstance to delete the word "while" and substitute in its place "by means of." ' " (*Hajek*, at p. 1184; see *Nieves*, at p. 465.) The purpose of the change was to " 'permit the finding of a special circumstance not only in a case in which a murder occurred immediately upon a confrontation between the murderer and the victim, but also in a case in which the murderer waited for the victim, captured the victim, transported the victim to another location, and then committed the murder.' " (*People v. Superior Court (Bradway)*) (2003) 105 Cal.App.4th 297, 307.)

But the evidence in this case is sufficient to support a true finding even under the earlier version of the statute, which required a " ' " 'continuous flow of . . . uninterrupted lethal events' " ' " from the initial lying in wait to the killing. (*Nieves*, *supra*, 11 Cal.5th at p. 465.) Here, there was only a brief interval between the lying in wait and the killing, a matter of a few minutes, at most. Even if the jury accepted Zacarias's version of events—that he and Judy talked and then struggled over the gun before he shot her in the back—those events necessarily took place right after she discovered him sitting in her back seat. Given the totality of the circumstances—Zacarias's threatening texts to Judy, his conduct of buying a gun then driving to Judy's place of work and hiding in her car, and his statements to the police that he wanted to show her that he had "had enough"—a rational jury could conclude that there was " 'no lapse' " in Zacarias's "culpable mental

16

state" and that " 'the shooting occurred without any "cognizable interruption" following the lying in wait under any legal standard.' " (*People v. Carpenter* (1997) 15 Cal.4th 312, 389.)

As the People correctly point out, cases vacating the true finding on the lying-in-wait special circumstance allegation have involved at least an hour's worth of nonlethal events between the lying in wait and the killing. (See, e.g., *Hajek*, *supra*, 58 Cal.4th at p. 1185 [several hours]; *People v. Lewis* (2008) 43 Cal.4th 415, 514 [one to three hours], disapproved on another ground in *People v. Black* (2014) 58 Cal.4th 912, 919-920; *Domino v. Superior Court* (1982) 129 Cal.App.3d 1000, 1012 [one to five hours].) On this record, the jury could have disbelieved Zacarias's testimony that he and Judy talked briefly and struggled over the gun before he shot her. But, even if they believed that a few minutes passed between concealment and shooting, they could nevertheless reasonably conclude that the brief time period was part of a " ' " 'continuous flow' " ' " of lethal events. (*Nieves*, *supra*, 11 Cal.5th at p. 465.) We therefore reject Zacarias's challenge to the special circumstances finding.

C. *Prior Serious Felony Enhancement*

In a bifurcated proceeding after trial, Zacarias admitted that he suffered the following three convictions: (1) a May 31, 1990 conviction for assault with a firearm (former § 245, subd (a)); (2) a May 31, 1990 conviction for shooting at an occupied vehicle or dwelling (§ 246); and (3) a December 17, 1991 conviction for robbery (§ 211). On the basis of those admissions, the trial court imposed three five-year prior serious felony enhancements under section 667, subdivision (a).

17

Zacarias argues that one of the prior serious felony enhancements based on the 1990 convictions must be dismissed because there is no evidence that the charges for the two 1990 convictions were "brought and tried separately" within the meaning of section 667, subdivision (a). The People agree with Zacarias, and we agree with the parties.

Section 667, subdivision (a)(1), provides in relevant part: "A person convicted of a serious felony who previously has been convicted of a serious felony in this state or of any offense committed in another jurisdiction that includes all of the elements of any serious felony, shall receive, in addition to the sentence imposed by the court for the present offense, a five-year enhancement for each such prior conviction *on charges brought and tried separately*." (Italics added.) The phrase "brought and tried separately" means that the underlying charges were formally distinct, from filing to adjudication of guilt. (*People v. Wiley* (1995) 9 Cal.4th 580, 593-595; *In re Harris* (1989) 49 Cal.3d 131, 136.)

Here, the record reveals that the two 1990 convictions took place in Los Angeles County on the same day. The People acknowledge that, although the case numbers associated with the convictions are not included in the record, "it would appear the crimes were brought and charged in the same proceeding." Because neither the record nor Zacarias's admission demonstrates that the two 1990 convictions were brought and tried separately, we vacate the prior serious felony enhancements based on the second May 31, 1990 conviction that Zacarias admitted suffering.

DISPOSITION

The prior serious felony enhancement based on the May 31, 1990 conviction for shooting at an occupied vehicle or dwelling is vacated.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS_____

J.

We concur:

MILLER_____

Acting P. J.


RAPHAEL_____

J.

19